**UNITED STATES of America,**
**Appellee,**

**v.**

**Seymour BEITSCHER and James E.**
**Riley, Appellants.**

**Nos. 71–1669, 71–1670.**

United States Court of Appeals,
Tenth Circuit.

Oct. 3, 1972.

Charles F. Brega, Denver, Colo., for appellants.

W. Allen Spurgeon, Asst. U. S. Atty. (James L. Treece, U. S. Atty., with him on the brief), for appellee.

Before SETH and HOLLOWAY, Circuit Judges, and LANGLEY, District Judge.

SETH, Circuit Judge.

This is a direct appeal from convictions of mail fraud in violation of 18 U. S.C. § 1341 by defendants, Seymour Beitscher and James E. Riley.

On October 18, 1965, Air-Way Sanitizor, Inc., an Ohio corporation which manufactures vacuum cleaners, entered into a franchise agreement with Seymour Beitscher, dba Air-Way of Colorado, for the distribution of the Air-Way Sanitizor vacuum cleaner and related parts, accessories, and attachments. The franchise was cancelled on September 27, 1966, and reference herein to Air-Way in no way relates to the Ohio manufacturer.

Appellant Beitscher, as president and chief executive officer of Air-Way of Colorado, was responsible for the hiring and training of the company's salesmen. Among the salesmen were appellant, James Riley, and defendants, Newton Paletz, John Broyles, and Albert Grey. Numerous other salesmen were employed at different times, having been trained by Beitscher, Riley, and Paletz. Larman Blanchaert, secretary-treasurer of Air-Way, was also named as a defendant, but was acquitted on all counts.

The indictment arose out of the referral selling plan devised by Mr. Beitscher. Prospective purchasers were initially contacted by either a telephone solicitor or through a classified advertisement for employment with Air-Way. Typically the advertisements stated that married women were needed "to make over $200 a month" in their spare time at home. The advertisements noted that each woman would receive a cash advance as high as $50.00, plus a bonus and free training at home. None of the advertisements mentioned the necessity of purchasing a vacuum cleaner prior to being hired. In all of the advertisements a phone number was listed through which a prospective employee could reach a representative of Air-Way, and accordingly interviews were arranged. The majority of women contacted by Air-Way were in some financial difficulty and in need of additional income. Each interview was to take place at the woman's home and in the presence of her husband.

The record shows that the employment interviews were in fact "openers" for vacuum cleaner sales. Provided with a stock sales pitch prepared by Beitscher, a salesman would appear at the prospective purchaser's home, and would seek to ingratiate himself by explaining the prospects of earning money soliciting sales appointments over the telephone. A salesman would ordinarily commend his individual ability to consummate a sale, further suggesting the likelihood of a profitable working relationship. As the interview progressed it would become apparent that employment with Air-Way was conditioned on the purchase of a vacuum cleaner, but by this time the prospect was so interested in the prospect of being gainfully employed that the purchase seemed insignificant. In this atmosphere a sale would be made, formalized by a chattel mortgage and a Purchaser Employee Agreement.

The cash price of the vacuum cleaner was $289.50. The majority of vacuum cleaners as shown by the record, however, were sold on a time payment plan, usually with a total price of $396.00, requiring monthly payments of $16.50. More often than not the paper was sold by Air-Way of Colorado to Nationwide Finance Company in Denver. When the vacuum cleaner was purchased, Air-Way then used one of several different "Air-Way Purchaser Employee Agreements" to accomplish the referral selling plan. The first agreement provided for a payment of $50.00 for every appointment the purchaser arranged which resulted in an "approved" purchase of a vacuum cleaner. Also, it was agreed that in the event no purchase was made during any given month the employee would be paid $25.00 per month plus the amount of the employee's monthly payment, provided further that the employee had arranged a sufficient number of "qualified" appointments from which twenty or more completed demonstrations resulted. An

"approved" purchaser. was one who met certain indicia of acceptable credit enumerated in the Purchaser Employee Agreement; a "qualified" appointment, as well, was defined in terms of credit, though the ultimate decision as to whether an appointment was qualified and a sale or purchase approved was reserved to Beitscher.

The second contract provided that a woman would receive $25.00 for the first appointment made by her which resulted in an approved purchase and $35.00 for each approved purchase thereafter. The agreement also provided that the company would make the employee's monthly payment if the woman's telephone solicitation resulted in one approved purchase per month. Absent a sale, the employee would receive $25.00 per month if she arranged twenty qualified appointments. The other three contracts were essentially the same, though payment was to be made in Gold Bond stamps instead of cash.

Each of the contract forms was prepared by Beitscher and a Denver attorney. The chattel mortgages were unmistakably chattel mortgages, and the record shows that the numerous purchasers, including the Government's twelve court witnesses, were aware that their "employment" was conditioned on the purchase of vacuum cleaners. It was also emphasized that if the phone solicitation was unproductive the employee would be responsible for the monthly payments. Finally, as a part of the overall sales scheme, the employee-purchasers were to receive a nonnegotiable advance payment coupon ranging in value from $25.00 to $50.00. The coupon could be exchanged at the company offices for a negotiable check of like amount once it had been established that the employee-purchaser's credit was satisfactory. The advance was actually in the nature of a loan, however, as the amount of the payment check was included in the purchase price of the vacuum cleaner and was to be paid back with interest. Few employee-purchasers

made any money, and the few who did made little.

Appellants assert six contentions. The offenses charged in the indictment occurred between August 1965 and October 1967; the indictment, however, was not filed until April 8, 1970. As more than three years had elapsed between the last alleged offense and the commencement of trial on February 8, 1971, appellants first contend that the delay was inherently prejudicial, constituting a denial of their Fifth and Sixth Amendment rights to due process and to a speedy trial. Noting that the Sixth Amendment right traditionally has been limited to the time between arrest and trial, appellants nevertheless assert that the entire time between the date of the initial offense and sentencing should be considered. It is further urged that without explanation such a lengthy delay by the Government can be assumed to be inherently prejudicial.

 The law, however, is clear: the rights of a defendant under the due process clause of the Fifth Amendment are not violated in the absence of a showing of actual prejudice resulting from the preindictment delay and that the delay was purposefully designed to gain tactical advantage or to harass the defendants. United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468. There has been no such showing here. The Sixth Amendment's guarantee of a speedy trial is applicable only after the defendant has been accused, which is ordinarily when he has been charged with a crime. This matter has been fully discussed in the Marion case. The indictment was returned well within the applicable five year statute of limitations. 18 U.S.C. § 3282; cf. United States v. Blosser, 440 F.2d 697 (10th Cir.).

 Appellants' second contention is that the trial court's failure to grant motions for severance constitutes reversible error. Pursuant to Rule 14, Fed.R. Crim.P., either severance of defendants or separate trials of counts may be

granted if it appears that a defendant is prejudiced by a joinder of offenses or defendants. The gist of the argument here is that because most of the defendants were not associated with Air-Way during the entire period covered by the indictment there was confusion as to what evidence pertained to which defendant. Our reading of the record, however, shows that the task of segregating certain testimony was not confusing but simply cumbersome. The jury was frequently reminded of the limited applicability of certain evidence, and was carefully instructed to consider the guilt of each defendant only as to the counts applicable to him during his period of employment. Both Beitscher and Riley testified, relying on the defense of good faith, and their relationship during trial did not foster mutual antagonism or prejudice. No problem was raised under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, as initially contemplated by appellants' motions for severance, and we find no manifestation of vicarious incrimination. The record does not indicate that the denial of the motions was an abuse of discretion. Lowther v. United States, 455 F.2d 657 (10th Cir.); United States v. Harris, 441 F.2d 1333 (10th Cir.); Bailey v. United States, 410 F.2d 1209 (10th Cir.).

Thirdly, appellants assert that the evidence cannot support convictions of mail fraud under 18 U.S.C. § 1341. Appellants' argument on this point does not go so much to the sufficiency of the evidence, but rather to the question of whether appellants' conduct fairly deserves to be legally characterized as fraud. See e. g. United States v. Rabinowitz, 327 F.2d 62 (6th Cir.). Exaggerated sales talk, it is suggested, is not fraud, and it is urged that proof of mere questionable behavior cannot support a conviction of mail fraud. Cf. United States v. Lynn, 461 F.2d 759 (10th Cir.). The conduct in the case at bar, however, was more than questionable. The offense of mail fraud lies in the use of the mails in furtherance of a scheme to defraud or obtain money or property by fraudulent means. Marvin v. United States, 279 F.2d 451 (10th Cir.). A scheme to defraud is one which is reasonably calculated to deceive persons of ordinary prudence and comprehension. United States v. Seasholtz, 435 F.2d 4 (10th Cir.). In this regard we are satisfied that the evidence was more than ample to present a jury question, and under the applicable standard of review we are convinced that it was sufficient to sustain a jury finding that the sales scheme was calculated to deceive prospective purchasers. Glazerman v. United States, 421 F.2d 547 (10th Cir.). We also take note that section 1341 was designed to protect the credulous as well as the skeptical. United States v. Sylvanus, 192 F.2d 96 (7th Cir.). Appellants' suggestion that their use of the mails was somehow remote in time and not incident to an essential part of the scheme to defraud is without merit.

Appellants' fourth assertion is that the trial court committed reversible error by inadequately instructing the jury on the defense of good faith. We have held that an instruction on good faith in a prosecution for mail fraud must adequately and sufficiently apprise the jury of the defendant's theory of defense. Beck v. United States, 305 F.2d 595 (10th Cir.). In the case at bar we believe that the instruction was clear and complete, fully satisfying acceptable standards. Sparrow v. United States, 402 F.2d 826 (10th Cir.). The trial court's rejection of appellants' instructions on the issues of good faith and intent, which additionally suggested that a favorable inference could be drawn from appellants' reliance on legal counsel, does not constitute error. The sufficiency of the instructions is not determined by the giving or failure to give particular instructions, but rather by viewing all of the instructions as a whole. Beck v. United States, supra.

Appellants also assert that the verdicts of not guilty with regard to de-

274

fendants Blanchaert, Grey, and Broyles were so inconsistent with the verdicts of guilty as against themselves and defendant Paletz that the guilty verdicts cannot stand. However, assuming that the verdicts were inconsistent or logically incompatible, the verdicts are not thereby rendered invalid. Lowther v. United States, 455 F.2d 657 (10th Cir.); United States v. Cowley, 452 F.2d 243 (10th Cir.); Speers v. United States, 387 F.2d 698 (10th Cir.).

 Finally, appellants assert that publicity adverse to their trial attorney effectively denied them their rights to a fair trial and to effective counsel. Trial lasted fourteen days. On the ninth day of trial counsel for defendant Broyles moved for the admission of a newspaper clipping relating to appellants' counsel's contemporaneous conviction for the misapplication of bank funds. Over a weekend about midway in the trial the Denver radio, television, and newspapers had given publicity to the conviction and a possible suspension from the practice of law. When the matter was brought to the attention of the court, the trial judge did not poll the jury as to whether they were aware of the publicity and whether it would affect their decision in the matter before them. Accordingly, it is urged that a new trial must be granted because the effect of the adverse publicity was unknown and no steps were taken to ascertain the extent of the prejudice.

While as a general proposition the trial court has an affirmative duty to assess the extent to which the jurors' impartiality has in fact been persuaded by extraneous influence, Silverthorne v. United States, 400 F.2d 627 (9th Cir.), the argument here rests upon three assumptions: (1) it first assumes that the jurors were actually aware of the publicity; (2) it assumes that publicity adversely reflecting on an attorney will be imputed to a client; and (3) it further assumes that there was sufficient probability of prejudice to warrant polling the

jurors. During the colloquy between the court and counsel on this matter no request was made by any of the attorneys to question the jurors, and appellants' counsel himself stated that he would object to a polling. The trial court was presented with the possibility that questioning the jurors would bring the matter to the attention of jurors who had not heard of it and unnecessarily emphasize it to the jurors who may have been familiar with it. Bearing this in mind, as well as the consideration that the publicity was unrelated to the issues being tried, no attempt was made to poll the jury. In our opinion despite these circumstances the matter remained within the sound discretion of the trial court. We find no abuse of discretion.

Affirmed.