UNITED STATES of America,
Plaintiff-Appellee,

v.

Leroy Basil McMANAMAN,
Defendant-Appellant.

No. 78–1168.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 26, 1979.

Decided Oct. 1, 1979.

Stephen K. Lester, Asst. U. S. Atty., Wichita, Kan. (James P. Buchele, U. S. Atty., Wichita, Kan., on brief), for plaintiff-appellee.

Thomas G. Hanlon, Tulsa, Okl., for defendant-appellant.

Before HOLLOWAY, BARRETT and LOGAN, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant Leroy Basil McManaman appeals his convictions of conspiracy to possess with intent to distribute and distribution of methamphetamine, a controlled substance, and of possession with intent to distribute and distribution of methamphetamine, in violation of 21 U.S.C. Sections 846 and 841(a)(1).[1]

Count I of the indictment charged that defendant and unindicted coconspirators Harold Richard Shipman (deceased), Mary Eileen Shipman (Harold Shipman's wife), and Roanna McManaman Barkley (defendant's daughter), were involved in the conspiracy at specified times in 1977. Counts II, III and IV charged possession with intent to distribute and distribution by defendant of methamphetamine on April 28, June 21,[2] and June 25 of 1977, respectively.[3]

The jury found defendant guilty of counts I and II, not guilty of count III, and reached no verdict as to count IV. Count IV was then dismissed on the Government's motion. (I R. 22; III R. 459–462). Defend-

---

[1] Section 841 of title 21 provides in part:

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance

. . . . .

\* \* \* \* \* \*

Section 846 provides:

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

[2] Though the indictment states that the second event of distribution, occurred on June 21, the Government at trial corrected this to conform with evidence that it occurred June 5. (III R. 379; cf. II R. 156).

[3] The violation charged in count II involved distribution through Harold Shipman to Danny Austin; the violation in counts III and IV, to Mary Shipman.

ant was sentenced to five years' imprisonment on each conviction, the sentences to run concurrently, and to a special parole term of two years. (I R. 22; III R. 467–471).

On appeal, defendant asserts error in the following particulars: (1) the overruling of his motion to dismiss due to delay in arrest and accusation; (2) the admission of evidence of a conversation between defendant and Mary Shipman, who was working for the Government, after defendant was arrested and in the absence of his counsel; (3) the admission through that conversation of highly prejudicial collateral evidence of plans to commit murder; (4) the admission of statements of Harold Shipman who was deceased at the time of trial;[4] (5) the admission of tapes of only a portion of a conversation between Harold Shipman and Government informer Danny Austin; and (6) the denial of a motion for judgment of acquittal based on insufficiency of the evidence.

While we conclude that we must remand for a new trial as explained in Part III, we discuss the other questions since they are matters which might bar prosecution altogether or will likely be problems in a further trial.

## I

### PRE–INDICTMENT DELAY

First, defendant contends that the delay from April 28 to July 6, 1977 in charging him was purposeful, prejudicial, and designed to gain for the Government a tactical advantage.

Defendant was originally charged by a complaint executed July 6, 1977, in the District of Kansas (I R. 1); he was arrested the same day. The complaint alleged one count of possession with intent to distribute and distribution of methamphetamine on April

28. An information filed on July 13 alleged possession with intent to distribute and distribution of the drug on that date. The superseding indictment described above was returned on August 26. At trial defendant challenged the delay in accusation and arrest by a motion to dismiss. The trial judge overruled this motion, holding that the delay of five to six months to investigate was not unreasonable. (II R. 7, 10).

On appeal defendant argues that the delay deprived him of the testimony of Harold Shipman who, if he had not died on May 22, "could have been a witness for the defendant." Further, the charges added in the indictment, especially the conspiracy charge, were added "for the sole purpose of illiciting [sic] hearsay testimony and that of the deceased, Harold Shipman." For these reasons defendant claims he has been deprived "of a fair trial as provided for by the 5th and 6th Amendments . . ." (Brief of Defendant, 5).

It is well-settled that "it is either a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 39 L.Ed.2d 468; *United States v. Lovasco,* 431 U.S. 783, 788, 97 S.Ct. 2044, 52 L.Ed.2d 752. Since the delay involved occurred before defendant was charged or restrained, his reliance on the Sixth Amendment is misplaced.[5]

To support a due process claim of unlawful preindictment delay under the Fifth Amendment the Supreme Court has made it clear that the defendant must show actual prejudice resulting from the preindictment delay and that the delay was purposefully designed to gain a tactical advantage or to harass the defendant. *United States v.*

---

**4.** Harold Shipman died on May 22, 1977. (II R. 151).

**5.** We note also that there appears to be no reliance on Rule 48(b), F.R.Crim.P., which permits district courts to dismiss indictments due to preindictment or postindictment delay, but

which, in any event, has been limited by the Supreme Court to "post-arrest situations." *United States v. Marion,* 404 U.S. 307, 319 & n. 11, 92 S.Ct. 455, 39 L.Ed.2d 468 (1971); *United States v. Lovasco,* 431 U.S. 783, 789 n. 8, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1976).

*Marion, supra,* 404 U.S. at 325, 92 S.Ct. 455; *United States v. Lovasco,* 431 U.S. at 790, 97 S.Ct. 2044; *United States v. Revada,* 574 F.2d 1047, 1048 (10th Cir.); *United States v. MacClain,* 501 F.2d 1006 (10th Cir.); *United States v. Redmond,* 546 F.2d 1386 (10th Cir.), *cert. denied,* 435 U.S. 995, 98 S.Ct. 1645, 56 L.Ed.2d 83; *United States v. Beitscher,* 467 F.2d 269, 272 (10th Cir.). In *Beitscher* we stated the test as follows (467 F.2d at 272):

> [T]he rights of a defendant under the due process clause of the Fifth Amendment are not violated in the absence of a showing of actual prejudice resulting from the preindictment delay and that the delay was purposefully designed to gain tactical advantage or to harass the defendants.

We cannot agree that any actual prejudice to defendant has been shown. The mere allegation that the deceased Shipman could have testified for the defendant does not establish that he would have so testified or that his testimony would have been helpful. In fact, defendant nowhere shows how the witness would have aided the defense, had he been available and willing. *See United States v. Lovasco, supra,* 431 U.S. at 786, 97 S.Ct. 2044. And there is no showing that the Government had any information that Shipman's death was imminent.

Moreover the entire period from the April 28 offense until return of the indictment on August 26 was only some four months, during which time investigation continued, events premising the two added substantive counts occurred, and additional evidence was gathered supporting the conspiracy charge. In the circumstances this was not an unreasonable period for a conspiracy investigation. The Supreme Court has said that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *United States v. Lovasco, supra,* 431 U.S. at 796, 97 S.Ct. at 2052.[6] In any event there is no constitutional right to immediate arrest, even when the Government's evidence becomes strong enough to support probable cause or guilt beyond reasonable doubt. Such a requirement would unduly fetter those charged with enforcing the laws, and would hamper other considerations affecting the justice done in an individual case. *See United States v. Lovasco,* 431 U.S. at 790–795, 97 S.Ct. 2040; *Hoffa v. United States,* 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374.

Thus we conclude that there was no error in denying the motion to dismiss based on the claim of pre-indictment delay.

## II

### THE CONVERSATION WITH MARY SHIPMAN

Defendant argues that statements he made to Mary Shipman in a conversation on August 1, 1977, should have been excluded. The conversation occurred at a tavern in Valley Center, Kansas, and the Wichita police recorded it as received from an electronic transmitter worn by Mrs. Shipman. Among other things the two referred briefly to some drug dealings between themselves (Ex. 25A at 23, 32–33) and also discussed in detail killing Government witness Austin and an agreement that defendant kill another man, George Poulos. (Ex. 25A at 5, 20, 21, 25, 27).

Defendant says the statements were obtained through secret interrogation by

---

**6.** In *Lovasco* the Court stated (431 U.S. at 795, 97 S.Ct. at 2051–52):

In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," . . . precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed," . . . . . This the Due Process Clause does not require. [Footnotes and citations omitted.]

Mrs. Shipman while working as a Government agent after defendant McManaman was charged and arrested and without the presence of his counsel,[7] in violation of his rights under the Fourth, Fifth and Sixth Amendments; that the statements were made after any alleged conspiracy had ended; and that the reference to doing away with Austin injected a highly prejudicial collateral issue. We will deal with the problem concerning secret interrogation after arrest and *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246, first.

At trial defendant testified in his own behalf. In addition to explaining that the various meetings with Mrs. Shipman and others involved loans and not drugs (III R. 298–300, 302–303, 310; *cf.* III R. 305, 332, 355–356), he denied ever having drug dealings with Mrs. Shipman or anyone else at any time. (III R. 300, 307, 310, 331). On cross-examination the Government, asking about specific statements in the August conversation, attacked this testimony. (III R. 343–347). Defendant either denied or could not remember these statements (*Id.*), and the Government in rebuttal offered evidence of the conversation. (III R. 348–349, 351–354, 357–359, 365; Exs. 25 and 25A).

The trial court overruled defendant's objection to questioning concerning the August 1 conversation, relying on *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (III R. 337), and admitted evidence of the conversation. At the time the objections to the transcript of the conversation (Government Exhibit 25A) were overruled and the tape was admitted, the trial court gave a cautionary instruction to the jury (III R. 367–68):

I will overrule it. The tape is admitted, ladies and gentlemen of the jury,

from a legal standpoint to be considered only in connection with or as to the question of impeachment of the testimony of the defendant. In other words, as to whether or not his testimony was truthful in view of the tape which you heard. You have to decide that issue. You have the issue as to what you wish to believe and that is part of your duty in determining the facts.

▪ It is clear that after he had been charged, had retained a lawyer, and had been released on bail, the defendant was entitled to the assistance of counsel under the Sixth and Fourteenth Amendments. *See Brewer v. Williams,* 430 U.S. 387, 400–401, 97 S.Ct. 1232, 51 L.Ed.2d 423. At that point the contact and discussions by Mrs. Shipman with the defendant, in the absence of his attorney, violated the defendant's Sixth Amendment rights as recognized by *Massiah.*[8] In fact, the Government concedes that under *Massiah* the challenged evidence was inadmissible in its case in chief, but stresses that it was offered only in rebuttal to impeach defendant McManaman's credibility, and only to show a prior inconsistent statement, citing *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1. (Brief of Appellee, 11–12).

An argument that illegally obtained evidence is offered only in rebuttal is not always a key for its admission. *See Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91. The Court there rejected an attempt during rebuttal to demonstrate, for impeachment purposes, the silence of a defendant after *Miranda* warnings were given. *See also Johnson v. Patterson,* 475 F.2d 1066, 1068 (10th Cir.), *cert. denied,* 414 U.S. 878, 94 S.Ct. 64, 38 L.Ed.2d 124. Here, however, the defendant made a "sweeping" denial of drug dealings during his testimony on direct examination, which was the

---

7. The transcript of the conversation in question on August 1, 1977, contains references to contacts that defendant had already had with his trial counsel, see Government Exhibit 25A at p. 31, and defendant had already been arraigned and had entered his not guilty plea on July 13, 1977. See Docketing Statement of Appellant and docket sheet of the District Court attached thereto.

8. Mrs. Shipman testified that a DEA agent and a Wichita police officer, who gave her a transmitter, accompanied her to the Valley Center meeting with defendant. (III R. 353–54). A Wichita officer confirmed his presence in the vicinity of the Valley Center meeting (*id.* at 358), and the Government witnesses did not deny the presence of the DEA agent on that occasion.

situation in *Walder v. United States,* 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed. 503.[9] Following the reasoning in *Walder,* we feel that the defendant here was not free to make such a sweeping denial of drug dealings by possibly perjurious testimony, in reliance on the Government's inability to challenge his credibility because its rebuttal evidence was illegally secured. *See Walder, supra,* at 65.

The later decisions likewise support use of the evidence for impeachment in a case like this. *See Harris v. New York, supra; Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570; *United States v. Bowers,* 593 F.2d 376, 379–80 (10th Cir.); *United States ex rel. Padgett v. Russell,* 332 F.Supp. 41 (E.D.Pa.). These are not cases decided in the context of conduct which was illegal under the *Massiah* Sixth Amendment rule. Nevertheless we feel that the same reasoning applies here. We hold that the statements were not rendered unavailable for impeachment because of the violation of the *Massiah* rule.

### III

### THE CLAIM OF UNFAIR PREJUDICE FROM THE DISCUSSIONS OF MURDER

■ While we feel that the McManaman-Shipman taped conversation of August 1 was available for impeachment purposes as explained in Part II, a serious question remains whether evidence of the conversation was improperly admitted because of highly prejudicial statements therein not related to the defendant's denials of drug dealings, which were subject to impeachment.

Defendant strenuously argues that admission of Government Exhibits 25 and 25A, the tape recording and transcript of the August 1 conversation between Mrs. Shipman and defendant, was highly prejudicial because of several statements by defendant and Mrs. Shipman planning the murder of Danny Austin, the Government informant. At trial objections on such grounds (*inter alia* that the statements

would be highly prejudicial and would raise collateral issues which could not be cured by instructions) were made and overruled, as were motions for a mistrial on the same grounds. (III R. 334–35, 339, 342, 362, 367, 371–73); (Brief of Defendant, 11–14).

As noted, the Government defends the use of this conversation for impeachment under *Harris v. New York, supra,* despite the violation of *Massiah.* However, the Government does not respond in its brief to this serious, separate question whether use of the entire conversation, including the explosive discussion of murders, was prejudicial error. At trial the Government argued that the discussion on the tape of preventing Austin from testifying and other statements all bear directly on defendant's direct examination. (III R. 373–74).

We note that in the conversation there were several places where defendant suggested that Mrs. Shipman bring Austin to Oklahoma, and that Austin would never come back. (Government Exhibits 25A, pp. 5–6, 20, 25). A motive for defendant's statements was shown in that Mary Shipman said in the conversation that Austin was going to testify that defendant McManaman gave him methamphetamine. (*Id.* at 13, 26). There were also statements in the conversation by defendant about killing another man, George Poulos. (*Id.* at 21, 27). The entire conversation was admitted by the trial judge, as noted earlier, on the basis that it was proper rebuttal evidence.

Small portions of the conversation directly impeach defendant's sweeping denial during his direct examination of drug dealings with Mrs. Shipman or anyone else. There was a statement by defendant recognizing that Mrs. Shipman owed him a thousand dollars, (*id.* at 23); that he would arrange for Mrs. Shipman to sell drugs for $15.00 a gram, "what [she had] been paying for it," and for them to divide the money (*id.* at 32); and that it costs "about two dollars a gram to make it" (*id.* at 33). However, these impeaching statements about drug dealings cover not more than

---

**9.** *Walder* was a case involving a violation of the Fourth Amendment and an offer of evidence of an unlawful seizure of heroin.

two of the 36 pages of the transcript, Government Exhibit 25A. By contrast, much larger portions of the conversation dealt with plans to murder Austin. There were seven clear statements by the defendant to the effect that Austin would never come back. (*Id.* at 5, 20, 25). Defendant also made two pointed remarks that he would dispose of Poulos, who was the target of Mrs. Shipman's hatred. (*Id.* at 21, 27).

While the small portions of the conversation touching directly on drug dealings were relevant, Rule 403, F.R.E., cautions that

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

We are mindful that the determination under the rule whether evidence should be excluded because its probative value is substantially outweighed, *inter alia,* by the danger of unfair prejudice is within the trial court's sound discretion. *United States v. Watson,* 594 F.2d 1330, 1344 (10th Cir.); *Texas Eastern Transmission Corp. v. Marine Office—Appleton & Cox Corp., et al.* 579 F.2d 561, 567 (10th Cir.). However, hearing and reading the taped conversation lead us to the conviction that the inflammatory talk of the plans of murders clearly must have predominated in impact over the discussion of drug dealings.

Even assuming some relationship of the discussion of Austin's murder to the drug transactions and to covering McManaman's trail, the probative value was far outweighed by the danger of unfair prejudice. Such evidence that defendants had threatened or attempted to kill Government agents or informers was held to have too great a prejudicial impact in *United States v. Weir,* 575 F.2d 668, 671–72 (8th Cir.). Such evidence was said to suggest a jury decision on an improper basis that defendants were "bad men." *Id.* at 671–72; 1 Weinstein's Evidence, Par. 403[03] (evidence

provoking the jury's sense of horror or instinct to punish).

We must keep in mind that the conversation as a whole is admitted by the Government to have been unlawfully obtained in violation of *Massiah.* See Part II, *supra.* Thus it could come in *only* for impeachment, in this instance to impeach defendant for his sweeping denial of drug dealings. But the Government did not offer only those parts of the lengthy conversation and the explosive portions were not excised, as can be done to avoid such dangers of prejudice. *E. g., Kilarjian v. Horvath,* 379 F.2d 547, 548 (2d Cir.).

Considering the record as a whole, and having heard and read the inflammatory conversation, we must hold that its probative value was substantially outweighed by the danger of unfair prejudice and that admission of the evidence was prejudicial error under the Rule.[10]

## IV

## THE STATEMENTS OF HAROLD SHIPMAN

■ Defendant contends that the trial court erred by admitting in evidence recorded conversations and other statements of the deceased Harold Shipman. He says that admissions of these statements denied him his Sixth Amendment right to confrontation.

Our decision in *United States v. Coppola,* 526 F.2d 764 (10th Cir.) rejected a hearsay objection in similar circumstances. There Coppola was charged with murdering one Hardaway, a participant along with Coppola in a prison drug-smuggling scheme. In furtherance of the drug conspiracy Hardaway made statements to his wife, also a coconspirator. These statements were admitted against Coppola in the murder trial as coconspirator evidence, despite Hardaway's unavailability due to his death. *See also United States v. Dunham Concrete Products, Inc.,* 475 F.2d 1241, 1249 (5th Cir.), *cert. den.,* 414 U.S. 832, 94 S.Ct. 65, 38 L.Ed.2d 66. Thus the statements made by the unindicted coconspirator, Harold Ship-

---

**10.** We also feel that there is a serious question whether the evidence should not have been

excluded under Rule 404(b), F.R.E., as inadmissible proof of other crimes, wrongs, or acts.

man, although deceased before trial, were nevertheless made during the course and in furtherance of the conspiracy and were not hearsay, and were admissible under Rule 801(d)(2)(E), F.R.E.

Of course, the Confrontation Clause and the hearsay rule have not been equated, *see Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 27 L.Ed.2d 213 (plurality opinion); *United States v. Roberts,* 583 F.2d 1173, 1175 (10th Cir.), *cert. den.,* 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 49, and we must address the Confrontation Clause because that is the specific objection raised here, although we feel that the hearsay ruling in *Coppola* is persuasive, our court there saying that coconspirators' statements ". . . are regarded, by reason of the relationship, as trustworthy and having probative value." 526 F.2d at 771. We feel that there are several indicia of reliability which justify admission of the statement although there was no confrontation of the declarant. *See Dutton v. Evans, supra,* 400 U.S. at 88–89, 91 S.Ct. 210.[11] For these reasons we see no error in the admission of the recorded conversations and statements of Harold Shipman.

## V

### THE AUSTIN–SHIPMAN TAPE

■ Further, defendant asserts error in the admission of a tape (Ex. 5) of the conversation between Danny Austin and Harold Shipman as the two drove to and from the Hutchinson meeting on April 28. He contends that the tape is unintelligible in many parts and that it records only 20 minutes of some 120 minutes of surveillance.

Austin testified as to the conversation and its contents. (II R. 35–37). Government agents recorded all that they received of the discussion. (II R. 119). And, most importantly, the recorder was on during the entire time when Shipman was outside the car in the Safeway parking lot (*see* II R. 123), which tends to negate the possibility that Austin obtained the drugs from someone other than Shipman. We are satisfied that the tapes were sufficiently audible and intelligible that their admission was not an abuse of discretion, particularly in view of Austin's testimony to which the tapes gave independent support. *United States v. Jones,* 540 F.2d 465, 470 (10th Cir.), *cert. den.,* 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551.

## VI

### SUFFICIENCY OF THE EVIDENCE

Defendant contends that evidence of the conspiracy and substantive violations charged in counts I and II, the only charges involved in this appeal, was insufficient to support his convictions. More specifically, he says that the evidence proves neither an agreement by him to participate in the conspiracy nor an overt act in its furtherance, and that it does not show any delivery of methamphetamine. In addition, he stresses that the Government failed to establish the existence of a conspiracy by independent evidence so as to make admissible coconspirator testimony under the coconspirator provisions of Rule 801(d)(2)(E), F.R.E. We will consider this issue despite the remand for a new trial since insufficiency of the evidence at the first trial would bar a retrial. *See Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1.

The basic rule for sufficiency of the evidence to sustain a conviction challenged on appeal was stated by Judge Hill in *United States v. Twilligear,* 460 F.2d 79, 81–82 (10th Cir.):

> This court is bound to view the evidence presented in the trial court in the light most favorable to the government to ascertain if there is sufficient substantial proof, direct and circumstantial, together with reasonable inferences to be drawn

---

11. We note several factors which support the reliability of Harold Shipman's statements: First, Shipman, as a participant in the conspiracy, was in a position to have personal knowledge of the matters of which he spoke. Second, the possibility that Shipman's statements were founded on faulty recollection is extremely remote, since the statements were made as part of the incident as it occurred or concerned recent events. Third, those statements tend to incriminate Shipman, so they can be said to be against his penal interest. We thus find sufficient indicia of reliability as to the Shipman statements.

therefrom, from which a jury might find a defendant guilty beyond a reasonable doubt.

Applying this test we must consider the sufficiency of the evidence as to the convictions on counts I and II.

■ The Government's independent conspiracy evidence came primarily from witness Mary Shipman. She testified that she had met McManaman in December 1976 or January 1977 (II R. 144, 164), that before then Harold Shipman had sold drugs for McManaman (II R. 144–145), but that from then until February 1977 McManaman would not supply Harold because Harold still owed him money for drugs he (Harold) had previously sold. (II R. 145). After arrangements had been made to repay the debt McManaman in February again began supplying Harold, and Mary accompanied Harold to several meetings with McManaman in which Harold either received "crystal" (methamphetamine) for resale or paid McManaman for drugs already received. (II R. 145–149). Mrs. Shipman also testified that after Harold's death she met with McManaman and he told her she "could continue selling drugs for him in Wichita like Harold had been doing if [she] wanted to." (II R. 153).

The Government presented other non-hearsay evidence of the conspiracy. Telephone toll records showed four long-distance phone calls between the Shipman and McManaman residences and twelve calls between the Shipman and Barkley residences within the conspiracy's duration. (Exs. 21, 22, 23, and 24; see also II R. 213–220, 230–231). There was testimony that at 10:15 p. m. on April 26, 1977, two days before the first substantive offense in the parking lot of a Hutchinson Safeway store, McManaman called the Shipman residence from a phone booth in Lubbock, Texas.[12] (II R. 136–138, 141–142; cf. III R. 300–301). There was testimony that some three hours before that Safeway meeting, McManaman and Shipman met in Wichita. (II R. 86–88, 107–108, 112–114, 198–199; see also III R.

302). And we feel that the circumstances support an inference that in the Safeway parking lot McManaman gave drugs to Harold Shipman in return for $1500, which the Government had given to informer Danny Austin to make the buy. (II R. 37–38, 96, 117, 134).

As detailed in Part II, supra, defendant testified in his own behalf. He stated that the April 28 meeting with Harold Shipman and other meetings between McManaman himself and Mrs. Shipman concerned loans, and not drugs; and that he had had no drug dealings with Mrs. Shipman or anyone else at any time. Other defense witnesses challenged Mrs. Shipman's veracity and suggested motives for her testifying against the defendant.

We feel that the evidence independently supports the jury's finding of a conspiracy. Mary Shipman's testimony as to the various arrangements between her husband and defendant, and as to defendant's statements that she could continue in the deceased Mr. Shipman's place, clearly supports an inference of an unlawful agreement. Her testimony as to the various exchanges of drugs and money, together with the testimony regarding the April 28 substantive offense, was sufficient to prove an overt act. The requisite knowledge and intent may be inferred from the parties' actions. Thus, it was proper to conclude that a conspiracy was sufficiently proved by independent evidence to admit the challenged statements of coconspirators. Further, the independent evidence and that of coconspirators' statements amply support the conspiracy conviction.

■ As to defendant's contention that no delivery was shown to support the April 28 distribution charged, we agree there was evidence that Austin did not actually see the drugs exchanged between McManaman and Shipman; that he did not know whether Shipman might have possessed the drugs when he left Austin's car or whether he had the DEA money when he returned to it; and that he could not identify McManaman.

12. The Government connected this call circumstantially with a call from Shipman's supplier from "a long ways away" or "600 miles away,"

which call was made at the same date and time. The call is referred to in the tapes of conversations objected to in this appeal.

The record expressly supports these points, (II R. 38–39, 71–74), and also reflects that Austin did not search Shipman either before or after the transaction. (II R. 69).

However other evidence implicates defendant McManaman. While the evidence is largely circumstantial, considering all of it against defendant's explanation that the meeting concerned only loans and not drugs (III R. 298–300, 302–03, 310), we feel it is substantial enough to support a finding of delivery and the corresponding guilty verdict as to count II.

We conclude there was no error in denying the motion for judgment of acquittal. Thus, a retrial is not barred by insufficiency of the evidence at the first trial.

In sum, for reasons stated in Part III the judgment is reversed and the cause is remanded for a new trial in accord with this opinion.