UNITED STATES of America, Appellee,

v.

Michael PORCARO, Defendant-Appellant.

No. 79–1060.

United States Court of Appeals,
First Circuit.

Argued Sept. 3, 1980.

Decided Jan. 28, 1981.

Rehearing Denied April 10, 1981.

Nicholas A. Abraham, Boston, Mass., by appointment of the Court, with whom Daniel F. Lenzo, and Abraham & Pappas, P. C., Boston, Mass., were on brief, for appellant.

Kathleen A. Felton, Atty., Dept. of Justice, Washington, D. C., with whom Edward F. Harrington, U. S. Atty., and Richard D. Gregorie, Special Atty., Boston Strike Force, Dept. of Justice, Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and KEETON, District Judge.*

KEETON, District Judge.

Defendant-appellant Michael Porcaro appeals from his conviction of federal conspiracy, attempted extortion, and racketeering, in violation of 18 U.S.C. § 1951 ("the Hobbs Act") and § 1962(c) and (d) ("RICO").[1] Appellant argues that (1) the district court erred in denying appellant's motion to sequester the jury, (2) newspaper articles appearing during the trial were so prejudicial as to deprive appellant of a fair trial, (3) the evidence was insufficient to support appellant's conviction on either of the two counts of attempted extortion under the Hobbs Act (which together constituted the RICO offense); (4) the government's delayed disclosure of certain exculpatory evidence constituted prosecutorial misconduct and deprived appellant of a fair trial; and (5) the district court erred in denying appellant's motion for a new trial based on newly discovered evidence. Finding each of these contentions to be without merit, we affirm.

I.

Appellant was one of nine individuals charged in a six-count indictment[2] with racketeering and extortion offenses involving the attempted takeover of a chain of New England massage parlors. Before tri-

---

\* Of the District of Massachusetts, sitting by designation.

1. RICO stands for Racketeer Influenced and Corrupt Organizations, referring to patterns of racketeering offenses made unlawful in 18 U.S.C. §§ 1961–1963 (1976).

2. Defendant Porcaro was charged only in counts one through five. Count six charged obstruction of justice in violation of 18 U.S.C. § 1503.

al five of the defendants—Angelo Mercurio, Richard Floramo, Orlando Napolitano, Samuel Nore, and Carmen Fuccillo—pled guilty to the charges contained in the indictment. Of the remaining defendants, Lynette Graebert was a fugitive from justice at the commencement of the trial, and John Jannoni was murdered before trial. Only appellant and Charles Tashjian went to trial in November 1978. After a fifteen-day trial, the jury convicted appellant on counts I (RICO conspiracy), III and IV (Hobbs Act attempted extortion) and V (substantive RICO offense); he was acquitted on count II (Hobbs Act extortion). Tashjian, charged only in count III of the indictment, was acquitted.

## II. *Sequestration of The Jury*

At the commencement of trial, appellant filed a motion to sequester the jury, on grounds that appellant anticipated an unusual amount of publicity regarding the case due to the "nature of the indictment" and the "type of people involved." The district court denied the motion, observing that there was no indication that the case would generate more than routine press coverage, that no public figures were involved, that no reporters were present in the courtroom, and that the court believed it sufficient to instruct the jury to decide the case solely on the basis of the evidence. In addition, the court had been informed that there was a shortage of available hotel rooms in Boston, and noted the potential inconvenience of transporting a sequestered jury to accommodations some distance away. The court did, however, express its willingness to reconsider a motion to sequester if later developments warranted it.

The decision whether to sequester the jury lies within the sound discretion of the district court. *E. g., Mastrian v. McManus,* 554 F.2d 813, 818 (8th Cir.), *cert. denied,* 433 U.S. 913, 97 S.Ct. 2985, 53 L.Ed.2d 1099 (1977). Appellant concedes that "failure to sequester a jury standing alone, could rarely, if ever, constitute reversible error." *United States v. Johnson,* 584 F.2d 148, 155 (6th Cir. 1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979). Sequestration is an extreme measure, "one of the most burdensome tools of the many available to assure a fair trial." *Mastrian v. McManus, supra,* 554 F.2d at 819. In light of the ample reasons stated by the district court for denying the motion to sequester, we find no abuse of discretion.

At the time of the motion, appellant's counsel's prediction of extensive media coverage was purely speculative. There was no claim of adverse pretrial publicity. Although appellant now stresses the co-defendants' guilty pleas as a reason for sequestering the jury, this factor was not mentioned by appellant's counsel at the time of the motion. The district court indicated its intention to instruct the jury to disregard any publicity that might arise (see *infra*), and was diligent in doing so. Despite the court's offer to reconsider sequestration if a publicity problem arose, appellant never renewed his motion to sequester once objectionable publicity appeared. Appellant has not demonstrated actual prejudice or even substantial likelihood thereof resulting from the failure to sequester. *See United States v. Johnson, supra,* 584 F.2d at 155. Under these circumstances, the district court did not err in refusing to sequester the jury.

## III. *Publicity During the Trial*

Appellant points to a number of newspaper articles concerning the case which appeared, principally in the *Boston Globe*, during the course of the trial, as being so inherently prejudicial as to require a new trial. The most prominent of these articles appeared on page three of the *Globe* with headlines such as "Five men admit guilt in massage plot," "Slain mobster tied to extortion," and "Suspected 'hit man' named in massage parlor trial." Articles concerning the case appeared on a majority of the days of the trial, authored by *Globe* reporter Richard Connolly, who regularly attended the trial. Although the reports were primarily objective accounts of the charges and the testimony and were often substantially repetitive of previous reports, several of the articles did contain objectionable, inadmissible information. The material ap-

pellant claims was most prejudicial was the disclosure of the co-defendants' guilty pleas; characterizations of various of the co-defendants as "organized crime figures" and the like; discussions of co-defendants' prior arrests, alleged bad acts, convictions and imprisonment, and Mafia ties; and repeated references to the "gangland-style" murder of Jannoni.

However, with the unfortunate exception of printing one witness's statement that appellant had "risen quite far in the [Mafia] organization" (together with the fact that the court had ordered it stricken and instructed the jury to disregard it), the various articles contained no prejudicial characterizations of appellant himself, his reputation, prior acts, arrests, or convictions, nor any speculation as to his guilt or innocence. The only explicit references to appellant merely recounted testimony heard by the jury. The crux of appellant's claim of prejudice appears to be that the articles implicitly linked appellant and his co-defendants as members of the same alleged plot, and thereby impermissibly tainted appellant with guilt by association in the mind of any juror who read the articles. Appellant argues that such frequent and relatively prominent articles in the leading local newspaper could not have failed to come to the attention of the unsequestered jury, who had not been explicitly instructed not to read the newspapers. Thus, appellant argues, the articles were *per se* prejudicial.

The district court's preliminary instructions stressed the jurors' duty "to decide this case solely on the basis of what you see and hear in this courtroom," pointed out the potential unreliability of edited newspaper accounts of a trial, and admonished that the jurors were not to decide "on the basis of what you may read in the paper as to what happened in the courtroom." However, the court declined to instruct the jurors to avoid exposure to media accounts of the trial, stating:

I am not going to tell you that if you see a newspaper story that has something to do with the case, don't read it. I am not going to impose that burden on you

and I have not been requested by counsel to impose that burden on you.

What I am imposing on you is the burden of remembering that your responsibility is to decide the case solely on the basis of what you see and hear in the courtroom. You don't need anybody else to tell you what you saw and heard here in this courtroom. You have good eyes and ears, good common sense, and you know what you have seen and heard in this courtroom.

...If there is any one of you who has read anything in the newspapers that causes you to have any doubt as to whether or not you have the ability to give all the parties in this case a fair and impartial trial ... then I want you to signify by raising your hand, and I will see you here at the bench....

In response, one juror indicated he had read about the guilty pleas and expressed confusion regarding the conspiracy charge. After questioning at the sidebar, both appellant's counsel and the prosecutor stated that they were satisfied that the juror remained impartial. Appellant raised no objection to the court's instructions or voir dire of the jury. Nevertheless, appellant now contends that the initial publicity "was so massive and so timed that it was prima facie prejudicial."

We note that defendant did not object to the district court's instruction, quoted *ante* at p. 5, or request an instruction to the contrary, and in fact affirmatively endorsed the court's handling of the matter. Thus, we do not have before us the question whether it would be error, over objection, to give an instruction stating or implying, as this instruction did, that jurors are free to read media accounts of the trial. We do not wish to be understood as approving such an instruction, however, and we take note of considered recommendations that, in any case that appears likely to generate media coverage, the trial court instruct jurors against yielding to the temptation to read, listen to, or watch newspaper, radio, or television reports of the trial. *E. g.,* ABA Standards on Fair Trial and Free

Press § 3.5(e), at 12–13 (1968); Revised Report of the Judicial Conference on the Operation of the Jury System on the "Free Press—Fair Trial" Issue, 87 F.R.D. 519, 529–30 (1980). *See United States v. Solomon*, 422 F.2d 1110, 1115–16 (7th Cir.), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2201, 26 L.Ed.2d 565 (1970).

■ For several reasons we reject appellant's argument that the newspaper coverage of the trial deprived him of a fair and impartial trial. First, appellant's failure to make timely objections to the district court's handling of the publicity issue or to request other inquiries and curative procedures is sufficient to foreclose appellant from now raising allegations of prejudicial publicity as grounds for a new trial.[3] Appellant never objected to any of the court's instructions or suggested a different course. To the contrary, appellant's counsel invariably expressed satisfaction with the court's repeated general instructions regarding the jury's duty to disregard any information about the case originating outside the courtroom and to decide the case solely on the basis of the evidence.

■ In *United States v. Perrotta*, 553 F.2d 247 (1st Cir. 1977), this court outlined the appropriate procedure to be followed by a district court in dealing with potentially prejudicial publicity occurring during the trial. Where such publicity is brought to the court's attention, the judge must first determine whether the information is in fact prejudicial. 553 F.2d at 249–50. If the court finds the publicity to be "genuinely prejudicial," *upon timely request of counsel* the court is required to conduct a two-step examination of the jurors to determine whether any jurors have heard or read the publicity in question, and, if so, the effect of the publicity upon the affected jurors. *Id.* at 250; *see Margoles v. United States*, 407 F.2d 727, 735 (7th Cir.), *cert. denied*, 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). Although there may be cases in which the likelihood of prejudice is so great as to require the trial judge to question the jur-

ors *sua sponte*, in the ordinary case it is incumbent upon defense counsel to request this procedure. *See Perrotta, supra*, at 251 & n.9; *United States v. Beitscher*, 467 F.2d 269, 274 (10th Cir. 1972).

■ In this case, however, appellant insisted that the jurors *not* be polled regarding any of the articles, despite the district court's offer to do so and the prosecutor's suggestion that this was the proper procedure. In each instance where appellant's counsel expressed "concern" as to the potentially prejudicial effect of a given newspaper article, the court asked what appellant wanted done, and in fact did all that was ever requested—*i. e.*, repeated its general admonition. Having deliberately waived the opportunity to ascertain whether any juror had in fact seen any of the allegedly prejudicial articles, and if so to inquire into the *effect* of any such exposure, appellant cannot now complain of the court's handling of the publicity issue. A district court has discretion in dealing with such matters, *see United States v. Jones*, 542 F.2d 186, 194 & n.9 (4th Cir.), *cert. denied*, 426 U.S. 922, 96 S.Ct. 2629, 49 L.Ed.2d 375 (1976). We find no abuse of that discretion here.

Despite his failure to demonstrate any indication of actual prejudice, appellant argues that the nature and extent of the publicity in this case was such that its collective impact "went beyond tolerable limits"; that prejudice must be presumed to have tainted the verdict. Thus, the argument goes, the burden of negating prejudice shifted to the government and appellant was relieved of the usual duty of showing actual juror prejudice or at least a substantial likelihood of prejudice. This argument is without merit.

■ The circumstances of this case bear no resemblance to the extreme "media circus" cases in which appellate courts have presumed prejudice without any showing of actual bias, in light of pervasive and sensational publicity attending the trial. *Cf.*

---

**3.** *But cf. United States v. Williams*, 635 F.2d 744 (8th Cir. 1980) (establishing strict *per se* rule requiring reversal even in the absence of any showing of any actual prejudice).

*Murphy v. Florida*, 421 U.S. 794, 798–99, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975); *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). As the Court of Appeals for the Fifth Circuit observed,

> The cases in which such presumptive prejudice has been found are those where prejudicial publicity so poisoned the proceedings that it was impossible for the accused to receive a fair trial by an impartial jury. The clearest paradigms . . . [are cases where] the press saturated the community with sensationalized accounts of the crime and court proceedings, and was permitted to overrun the courtroom. . . .

*United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir. 1979), *cert. denied*, 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980). By contrast, the publicity in the instant case was relatively restrained and consisted primarily of accurate accounts of the previous day's testimony. Indeed, the trial judge explicitly took note of the articles' accuracy and lack of sensationalism midway through the trial. Although certain information reported in the articles—for example, the co-defendants' guilty pleas, the murder of one defendant, alleged underworld connections, and references to co-defendants' prior convictions and arrests—would have been manifestly improper for the jury to consider as evidence, the publicity in question did not refer *to appellant* in a way that inherently impeded fair and impartial consideration of the evidence by the jury before whom he was tried. The fact that such articles were published during the trial, without more, is insufficient to warrant a presumption of prejudice.

▮ In the usual case, where the publicity appearing during the trial is neither inherently prejudicial nor unusually extensive, the defendant must assume the traditional burden of showing actual jury prejudice. *Gordon v. United States*, 438 F.2d 858, 874 (5th Cir.), *cert. denied*, 404 U.S. 828, 92 S.Ct. 139, 30 L.Ed.2d 56 (1971).

Here, however, appellants rely solely on the presumption of prejudice and have shown no indication whatsoever of actual prejudice, or even the likelihood of prejudice, resulting from the articles. Any claim of prejudice is thus purely speculative, based on the unsubstantiated assumptions that (1) at least one juror read one or more of the articles, (2) the juror was so influenced by the article as to lose impartiality, and (3) the juror's bias was not dispelled by the court's repeated instructions to disregard such outside influences. Even if we assume that the jurors were exposed to the publicity in question, that does not necessarily require reversal. *See, e. g., United States v. Williams*, 568 F.2d 464, 470 (5th Cir. 1978). Due process requires only that a juror exposed to such publicity "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Although not in itself conclusive, the fact that the jury completely acquitted appellant's co-defendant Tashjian, and acquitted appellant of one of the counts of extortion, tends to suggest that the jury adhered to the court's instructions and made an unbiased determination of appellant's guilt.

In summary, it cannot be said that appellant was denied a fair trial by reason of prejudicial publicity.

## IV. *The Sufficiency of the Evidence*

In considering the sufficiency of the evidence supporting appellant's conviction on Counts III and IV, we review the facts and all the reasonable inferences to be drawn from them in the light most favorable to the government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Doran*, 483 F.2d 369, 372 (1st Cir. 1973), *cert. denied*, 416 U.S. 906, 94 S.Ct. 1612, 40 L.Ed.2d 111 (1974).

Counts III and IV charged appellant with two instances, respectively, of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. That statute provides, in pertinent part:

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

(b) As used in this section—

&ast; &ast; &ast; &ast; &ast; &ast;

(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

## A. *Count III*

Count III arose out of the alleged attempt by appellant and others under his control to evict by extortionate means the franchises of the Swedish Sauna massage parlor in Reading, Massachusetts. The evidence, viewed most favorably to the government, indicated that appellant, through a corporation which he controlled ("G.M."), attempted to coerce the franchisees of the Reading Swedish Sauna (Farina and Mancinelli) either to purchase the franchise or vacate it some three months before the expiration of the franchisees' contract to operate the sauna, and that appellant and his agents explicitly disclaimed any reliance on or adherence to the contract, and attempted to intimidate the franchisees through threats and physical violence.

■ It is the jury's responsibility to choose among various reasonable constructions of the evidence. *United States v. Klein*, 522 F.2d 296, 302 (1st Cir. 1975). The evidence is clearly sufficient to support appellant's conviction for attempted extortion under Count III. The jury could reasonably have concluded from the evidence before it that appellant and his associates attempted to force Farina and Mancinelli to pay $50,-000 for the right to operate the sauna or to vacate, with threats of physical harm and actual violence, at a time when Farina and Mancinelli had contractual rights to operate the facility. There was testimony that appellant himself demanded that Farina and Mancinelli buy or vacate prematurely, and testimony from which it could be inferred that appellant, under the alias of "Mr. Michaels," controlled G.M. and the acts of its agents, including Floramo and Mercurio. The undisputed fact that negotiations to buy the sauna franchise took place between appellant and Farina and Mancinelli and that some agreement was eventually reached does not vitiate a finding of attempted extortion. The jury heard and rejected appellant's arguments to the contrary.

■ Appellant argues that even if the above actions are all attributed to him, he nevertheless cannot be convicted of violating the Hobbs Act because he was acting pursuant to G.M.'s "inherent right" to enforce the terms of the management agreement against Farina and Mancinelli. Thus, relying on *United States v. Enmons*, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), appellant contends that his actual or threatened use of force, violence or fear to persuade Farina and Mancinelli to relinquish their rights to the sauna was not "wrongful" within the meaning of 18 U.S.C. § 1951(b)(2). This argument is without merit.

*Enmons* dealt with the question whether the use of violence (sabotage of equipment owned by the employer) by striking union members in order to obtain higher wages and other benefits constituted extortion under the Hobbs Act. In a five-to-four decision, the Supreme Court held that the use of unlawful means to achieve legitimate union objectives—*i. e.*, greater compensation for genuine services—does not violate the Hobbs Act. The court concluded that the term "wrongful" in the Act "limits the statute's coverage to those instances where the obtaining of the property itself would be 'wrongful' because the alleged extortionist had no lawful claim to that property."

410 U.S. at 400. The majority relied heavily on the legislative history of the Hobbs Act, which it found "[made] it clear that the act does not apply to the use of force to achieve legitimate *labor* ends." *Id.* at 401 (emphasis added). The court noted that strike violence is nonetheless punishable under state law.

Appellant's reliance on *Enmons* is misplaced. First, the evidence was sufficient to support a finding that appellant and his associates were not in fact acting in reliance on any contractual rights they may have had to the premises under the Management Agreement when they threatened Farina and Mancinelli and demanded immediate payment of the $50,000 or eviction. No legal basis for these actions was even suggested at the time. It is undisputed that Farina and Mancinelli's contract to operate the Reading sauna extended to August 31, 1975. Both appellant and co-defendant Mercurio disclaimed any reliance on the contract. It was not until late June, 1975, nearly one month after G.M.'s agents assaulted Farina, that G.M. first purported to assert its contractual right to evict Farina and Mancinelli for alleged violations of the Management Agreement.[4] Thus, it could be reasonably inferred that appellant's assertion of property rights to the premises was a mere pretext, resorted to only after attempts to obtain the property (or money) prematurely through intimidation had failed. *Enmons* does not permit a subsequently conceived, post-violence legal claim to property to sanitize retroactively an attempted extortion.

█ Second, quite apart from misplaced reliance on alleged property rights, appellant's interpretation of *Enmons* is without support. *Enmons* is a labor case dealing with the unique problem of strike violence. *United States v. Cerilli*, 603 F.2d 415, 419 (3d Cir. 1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980). *See also United States v. Quinn*, 514 F.2d 1250,

1257 (5th Cir. 1975), *cert. denied*, 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976), (*Enmons* limited to "use of coercive tactics to obtain increased wages" in pursuit of "legitimate labor objectives"). We are aware of no case sustaining an *Enmons* defense to a Hobbs Act conviction outside the labor area, and of several that have explicitly declined to do so. *Cf. United States v. Warledo*, 557 F.2d 721, 729–30 (10th Cir. 1977) (Indian group's threats and violence to coerce railroad to pay for alleged tribal lands); *Cerilli, supra* (state employee's extortion of "political contributions" from equipment contractors). As the Court of Appeals for the Third Circuit noted in *Cerilli, supra*,

> The [*Enmons*] court's reasoning was obviously and explicitly tied to the labor context and more specifically to the strike context. Any application of *Enmons* to cases outside of that context must be done with caution. Otherwise, there is danger that *Enmons,* if read as the appellants read it, could effectively repeal the Hobbs Act.... Thus we understand *Enmons* as not relying primarily on the legitimacy of the union's objectives but rather on the clear Congressional intent ... that violence during labor strikes not be punishable as extortion under the Hobbs Act.

603 F.2d at 419–20. We concur in this reading of *Enmons*, and find no basis for extending *Enmons* to protect from Hobbs Act prosecution the use of force and threats to resolve a contractual dispute among businessmen. Even assuming appellant had a legitimate claim to either the Reading sauna or the $50,000 sale price, his argument that *Enmons'* reasoning extends beyond labor disputes to eviction cases and the like is unpersuasive. Thus, we hold that the evidence was legally sufficient to convict appellant of attempted extortion under Count III. [In accordance with the Rules of the

---

4. G.M. representatives appeared at the Reading establishment on June 20, 1975 to attempt to evict Farina and Mancinelli, but were ordered to leave by a uniformed policeman. By letter of June 27, 1975, G.M.'s attorney demanded that Farina correct alleged violations of paragraph 9 (Payments to Company), 11 (Covenant not to Compete), and 19 (Operator's Defaults) or be evicted.

U.S. Court of Appeals for the First Circuit, App. I B (1979), parts IV(B) and (C), V, VI, and details of the review of evidence in parts III and IV(A) are excluded from publication except to the parties.]

*Affirmed.*