**UNITED STATES of America, Appellee,**

v.

**Audrey BAILEY, Defendant, Appellant.**

**No. 87–1023.**

United States Court of Appeals, First Circuit.

Heard July 29, 1987.

Decided Dec. 2, 1987.

---

Gail S. Strassfeld with whom Nancy Gertner, by appointment of the court, and Silvergate, Gertner, Fine, Good & Mizner, Boston, Mass., were on brief, for appellant.

Paul F. Healy, Jr., Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL, Chief Judge, and NOONAN * and SELYA, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

Defendant-appellant Audrey Bailey was indicted and convicted on one count of corruptly endeavoring to influence a juror in violation of 18 U.S.C. § 1503 (1982).[1] The government's principal witness was Nancy Grant, the juror whom Bailey allegedly tried to influence. Grant was a neighbor and acquaintance of Bailey's in a housing project near Boston.

Grant testified substantially as follows. Grant had been sitting in Boston as a juror in a lengthy, highly publicized federal criminal case known as *United States v. Angiulo*. One Saturday morning in February 1986, when the *Angiulo* trial was reaching the stage at which the case was about to be submitted to the jury, Bailey came to Grant's apartment and invited Grant to "Name your price. Name your figure." Grant inferred that someone had sent Bailey to make this proposition. As soon as Bailey left the premises, Grant reported the conversation to a neighbor. Bailey fol-

lowed up this visit with a phone call the same evening, asking Grant if she had "thought about it." Grant's response to Bailey on each occasion was along the lines of "you've got to be kidding."

The next morning Grant telephoned Bailey and told her, "No way, shape, or form." She added that Bailey would be in serious trouble once the judge learned of her proposition, a censure to which Bailey responded with words of apparent remorse. Grant reported Bailey's overture to the presiding judge, who immediately dismissed Grant from service on the *Angiulo* jury.

The government called three additional witnesses. District court clerk Robert Lovett testified about the circumstances of Grant's disclosure to the *Angiulo* court of Bailey's proposition. Barbara Phillips, Bailey's supervisor at Community Workshops, an employment rehabilitation center, testified that a few days before Bailey's overture to Grant, Bailey had told Phillips of a conversation with Bailey's own daughter. The daughter told Bailey there might be "something in it" for Bailey if she were to approach one of the jurors she knew. The third witness was Mary Tegan, Nancy Grant's next-door neighbor, who testified that Grant had informed her of Bailey's proposition.

The defense called one witness. Betty Adams, a neighbor and acquaintance of both Bailey and Grant, testified that Grant had a reputation for untruthfulness. She also testified that during the time Grant was serving on the *Angiulo* jury Grant once remarked that if she were offered enough money she could sway the verdict.

Bailey makes five main arguments on appeal. First, she contends that the district court's refusal to provide her with the names and addresses of the jurors who sat with Grant during the *Angiulo* case violated her constitutional right to present her defense. Second, the district court erred by refusing to instruct the jury on the

---

\* Of the Ninth Circuit, sitting by designation.

1. The statute provides in relevant part,
   Whoever corruptly ... endeavors to influence, intimidate, or impede any grand or petit juror ... shall be fined not more than $5,000 or imprisoned not more than five years, or both.

defense of abandonment. Third, hearsay testimony was erroneously admitted into evidence. Fourth, the prosecutor made improper remarks in his closing argument. And fifth, the district court erred by excluding evidence of Grant's violation of her juror's oath.

We retain jurisdiction and remand on the first of Bailey's claims of error, and reject the others. We discuss these contentions seriatim.

## I. JUROR INTERVIEWS

In a pretrial motion, Bailey requested the court to order the government to provide to her, inter alia, the names and addresses of the petit jurors in the *Angiulo* case, the case on which Nancy Grant had been sitting as a juror when Bailey allegedly tried to influence her. The government opposed the request, noting that the district court in *Angiulo* had impounded the names of the jurors and may have entered a protective order prohibiting contact with these jurors or disclosure of their names. The request was denied by a magistrate. Bailey moved the district court for reconsideration of the magistrate's ruling, arguing that a chance to interview the jurors with whom Grant had been sitting for eight months before Bailey's alleged approach was essential to the preparation of her defense. She stressed that Grant was the government's chief witness, and that she wished to explore the jurors' perceptions of the character and credibility of Nancy Grant, and to learn of any remarks Grant may have made to her fellow jurors indicative of a disposition to fabricate testimony against Bailey. Bailey agreed that these interviews might be held under court supervision, but wanted them to be ex parte, a proposal opposed by the government. The court denied Bailey's motion for reconsider-

ation of the magistrate's ruling,[2] and a week later denied Bailey's subsequent motion for reconsideration of the court's decision. During the trial, however, Bailey was given leave to conduct a very limited interview with two of the jurors about a specific incident.[3]

On appeal, Bailey essentially reiterates her argument that was unsuccessful below. She says that denying her access to these jurors violated her constitutional right to present a defense. Bailey argues that the jurors, by virtue of their close contact with Nancy Grant over their eight months of shared jury duty, were a potentially potent source of information on, inter alia, (1) Grant's credibility, and (2) any motive or disposition Grant may have had to fabricate the charges against Audrey Bailey.

### A. *Applicability of 'Kepreos'*

The government relies heavily on *United States v. Kepreos*, 759 F.2d 961 (1st Cir. 1985), to defend the court's pretrial ruling. In *Kepreos*, the prosecutor surreptitiously interviewed jurors who had previously served on a hung jury, so as better to prepare for a forthcoming new trial. A panel of this court announced a prophylactic rule that, "this Circuit prohibits the postverdict interview of jurors by counsel, litigants or their agents except under supervision of the district court, and then only in such extraordinary situations as are deemed appropriate." *Id.* at 967. There had been in *Kepreos* no advance impoundment of the interviewed jurors' names and addresses, nor any prior judicial protective order barring juror interviews. We said, nonetheless, that "[p]ermitting the unbridled interviewing of jurors could easily lead to their harassment, to the exploitation of their thought processes, and to diminished confidence in jury verdicts, as well as to

---

**2.** We do not construe the district court's refusal as turning on whether or not Bailey would be satisfied *only* with an ex parte interview. The court did not offer to allow witness interviews under any terms.

**3.** In the middle of the second day of trial, during a recess from the cross-examination of Nancy Grant, the district court gave defense counsel a brief opportunity to interview two jurors

whom defendant had subpoenaed to trial. The scope of the interview was confined to questions about Grant's comments to her fellow jurors about a conversation she had had with her cab driver, who had claimed to be related to one of the defendants in the case. We do not regard this interview as providing the kind of access to all the jurors appellant had initially sought, and the denial of which she now challenges.

unbalanced trial results [*i.e.,* in the successor trial] depending unduly on the relative resources of the parties." *Id.*

The government argues that the pronouncement in *Kepreos* forbade juror interviews here. Alternatively, the government submits that even if this were the "extraordinary situation" which, under *Kepreos,* would warrant a post-verdict interview of jurors, the district court's error was rendered harmless by Bailey's eventual opportunity to interview two of the jurors. *See* note 3, *supra.*

*Kepreos,* however, is not squarely apposite. In the instant case the lower court's power to regulate access to the *Angiulo* jurors did not depend upon the prophylactic rule announced in *Kepreos,* but rather upon the fact that—as the names and addresses of the jurors had been impounded by the *Angiulo* judge, who may also have issued other protective orders—Bailey's counsel had to seek the court's assistance to secure access to them. The district court had ample authority to consider, and, depending on the circumstances, to grant or deny such a motion. *Kepreos,* therefore, was not the determining precedent. Indeed, *Kepreos* does not expressly cover the present situation. *Kepreos* forbids post-verdict interviews of jurors by "counsel, litigants or their agents," language which, on the facts of *Kepreos,* would extend to interviews by lawyers in and parties to the same trial in which the jurors served. Neither Bailey nor her counsel— the potential "interviewers" here—had this relation to the *Angiulo* trial.[4]

### B. *The 'Roviaro' Balancing Test*

The precedent most apposite to the present situation is *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1956). There the defendant in a drug prosecution moved, before trial, for a bill of particulars containing, inter alia, the identity and current address of a government informer who had taken part with him in the charged crimes. Holding that the dis-

trict court had erred in denying the motion, the Supreme Court ruled that the so-called "informer's privilege"—the government's privilege to withhold an informer's identity, or the contents of his communication— must give way where such identity or communication is "relevant and helpful to the defense of an accused, or . . . essential to a fair determination of a cause." *Id.* 353 U.S. at 60–61, 77 S.Ct. at 628.

■ *Roviaro,* to be sure, relates specifically to informers, not to the relatively rare situation presented here, where *jurors* in one case are sought as potential witnesses in another. And informers enjoy a special privilege to have their identities kept secret. *Id.* 353 U.S. at 59, 77 S.Ct. at 627. But the *Angiulo* jurors' names and addresses had been earlier impounded. That order, in an organized crime case, was well within the *Angiulo* court's authority. It created a mantle of protection very similar to the informer's privilege, and for an analogous civic purpose. *Id.,* 353 U.S. at 59, 77 S.Ct. at 627. When and whether to relax such a protective order so as to permit an accused to have access to jurors as potential witnesses depends upon much the same general principles as were considered in *Roviaro.*

In *Roviaro* the Court concluded that, notwithstanding its important object, the informer's privilege had to give way when necessary to enable a defendant in a criminal trial to present an adequate defense. The *Roviaro* Court prescribed a balancing test, to be applied on a case-by-case basis, to determine when the informer's privilege had to yield to an accused's right to defend:

We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into

---

4. We recognize, of course, that Bailey's trial for jury tampering was a direct outgrowth of jury service by the *Angiulo* jurors, and that many of the policies underlying the *Kepreos* rule are relevant. We expressly do not decide here the precise scope of the *Kepreos* prohibition. Even if *Kepreos* did apply to these facts, we would reach the same result we do below. *See infra.*

consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors.

*Id.* 353 U.S. at 62, 77 S.Ct. at 628.

We think that in the analogous situation presented here such a balancing test is the proper guide for determining whether Bailey's counsel should have been granted access to the jurors for the purpose of conducting initial interviews, under court supervision, to determine if they possessed information helpful to Bailey's defense.

■ We note that since *Roviaro*, the Supreme Court has made it plain that the "right to defend" is constitutionally protected. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1972) ("the right to defend against the state's accusations" is protected under the due process clause of the Fifth Amendment); *Washington v. Texas*, 388 U.S. 14, 23, 87 S.Ct. 1920, 1925, 18 L.Ed.2d 1019 (1967) (Sixth Amendment right to compulsory process includes right to secure witness's attendance and to have a witness's testimony properly admitted); *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1973) (Sixth Amendment encompasses right to cross-examine); *California v. Green*, 399 U.S. 149, 176, 90 S.Ct. 1930, 1944, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring) (clauses guaranteeing rights to confrontation and compulsory process "constitutionalize the right to a defense as we know it"). Thus the right described in *Roviaro*, the right of an accused to have access to an available witness whose evidence is relevant, is of constitutional dimension.

This is not to suggest that the application of a balancing test as set out in *Roviaro* ensures that the accused will always gain access to the witness he desires. In the analogous case of *United States v. Valenzuela–Bernal*, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982), the Supreme Court upheld the deportation prior to trial of illegal aliens the defendant was charged with criminally transporting. The defendant claimed the aliens were witnesses necessary to his defense. The Court

held that before the government could be burdened with maintaining the aliens in this country as material witnesses, the defendant was required to make a sufficient showing that they could provide evidence that would be "both material and favorable to the defense." *Id.* 458 U.S. at 873, 102 S.Ct. at 3449. In ruling the defendant had failed to make this showing, the Court pointed out the expense and unfairness to the government of maintaining illegal aliens in custody, contrary to congressionally mandated immigration policy, simply because they might *conceivably* turn out to be helpful to the accused's defense. *Id.*, 458 U.S. at 863–66, 102 S.Ct. at 3444–46. Moreover, as the accused had himself been in the company of the would-be witnesses during the commission of the crime, the Court felt that he could be expected to show, as a condition to the government's holding the aliens as witnesses, "the events to which a witness may testify, and the relevance of those events to the crime charged." *Id.* 458 U.S. at 871, 102 S.Ct. at 3448. (The Court emphasized that the accused's burden did not go so far as to include avowing precisely *how* a witness may testify, or presenting a "detailed description" of the witness's lost testimony. *Id.*)

We do not view *Valenzuela* as setting forth a static rule in respect to the showing a defendant must make in every case. Rather, *Valenzuela* reflects the proper balancing in that particular setting, a setting where the federal interest weighing against access to the witnesses was particularly strong, and where the crime was one in which the accused and the putative witnesses had jointly participated. The showing of materiality and favorableness that an accused must make in one setting may not be the same as in another, since the accused's ability to predict what the witness will say may vary, as will many other relevant factors, including the harm to the government in being forced to produce the witness.

### C.  *The Balancing Test Applied*

■ In the present case, Bailey herself— unlike the defendant in *Valenzuela*—had

not associated in any manner with the *Angiulo* jurors. Hence she could not have been expected to know what they actually witnessed, or even to have predicted with certainty that their testimony would have been favorable to her. The question before us, then, is whether the interest in nondisclosure—an interest shared by the public, the government, and the jurors themselves—was outweighed by Bailey's interest in disclosure, namely, the likelihood that these people, who had been intimately associated with the prosecution's chief witness, Grant, for eight months in a setting linked to the charged crime, *may* have had information helpful to her defense. We think the answer is in the affirmative.

First, we see little chance that the interests of the public, the government, or the jurors would have been harmed had the court here granted to Bailey restricted access to the jurors. Counsel for the defendant accepted the suggestion that the interviews be subject to control by the court. Initially, the interviews could properly have been limited to determining whether any of the jurors possessed relevant information; if not, there would have been no occasion to allow a juror to be called as a witness at trial. Given the *Angiulo* court's legitimate interest in protecting the jurors, who were performing a high civic duty when sitting in that case, we have no question but that the security curtain drawn by the impoundment order should have been lifted only to such degree as was needed to protect Bailey's essential rights. Thus, for example, irrelevant or intrusive questions, or questions that might frighten or intimidate a juror, could and should have been controlled. In brief, we think that the court's supervision of the interviews would have rendered them only marginally burdensome to the individual jurors, and thus an insignificant detraction from their discharge of their civic duty. We also note that the factual scenario presented here, *i.e.*, interviewing jurors because they are potential witnesses in another case, is unlikely to recur with any frequency, thus lessening the danger that any burden that is imposed on these jurors will deter otherwise willing citizens from jury service.

From the perspective of the government's interest in the *Angiulo* prosecution, which was completed before Bailey's pretrial request, there was little to fear from such court-supervised interviews. The court could reasonably have taken all precautions to exclude irrelevancies concerning trial of the *Angiulo* case itself. Since Grant was discharged from jury service before deliberations began in the *Angiulo* case, the interviews need not have touched on juror deliberations in the *Angiulo* case.

We turn to the interests of the jurors themselves. While summoning the jurors for interviews might have been an annoyance to them, it is difficult to see that the jurors' security or other vital interests would have been impaired. Initially, at least, it would not even have been necessary to reveal the jurors' identities to counsel; we see no reason why the jurors could not have remained anonymous for purposes of the interviews. If revelation of the identities of any of the jurors subsequently proved, to the district court, to be appropriate, we have no doubt that any additional burden to the jurors could have been minimized. Bailey's attorney, an officer of the court, could have been expected to cooperate in protecting the jurors' identities to whatever degree was appropriate if so requested. We also note that the jurors were presumably already known by name to counsel in the *Angiulo* case, and had been observed daily by spectators in the courtroom and by the press. In brief, the inconvenience and stress to the jurors would have been confinable to little more than that to which any ordinary witness is subjected.

On the other side of the scales, we place the potential relevance and utility to Bailey of the information possessed by the jurors. Bailey's pretrial memoranda stressed her desire to ask the jurors about Nancy Grant's character and credibility as well as any motive for fabrication Grant may have had. From these memoranda, it was evident that the thrust of Bailey's defense was that Grant was a habitual liar, and that she fabricated, or at least grossly exaggerated, her encounter with Bailey in

order to dramatize herself and be relieved from jury duty.

During the eight months Grant sat with them, her fellow jurors were positioned to have found out what untoward feelings, if any, Grant harbored about serving on that jury. If she in fact ever made any remarks suggestive of a desire to find a way to quit the jury, or indicative of a motive, intent or disposition to fabricate accusations of jury tampering against someone, the other jurors might well have heard them. Her fellow jurors might also have formed an adverse opinion as to Grant's character or credibility. If not admissible in direct testimony, such evidence—including evidence of specific acts undermining her credibility—could possibly have been utilized on cross-examination, see Fed.R.Evid. 608(b), or might have led, as discovery evidence sometimes does, to other admissible evidence, cf. Fed.R.Civ.P. 26(b)(1).

We recognize that it is by no means certain that anything useful to Bailey would have been uncovered from the jurors. Still, we are not inclined to discount the importance of the juror interviews. We think any competent defense attorney would have wanted to interview these jurors, to see what they did or did not know. They had been closely associated with the prosecution's key witness in the central undertaking—service on the *Angiulo* jury —to which the jury tampering charge was related. Unlike the defendant in *Valenzuela*, the deportation case discussed above, Bailey was in no position to give an advance description of their evidence, which was not anything she herself had witnessed. Part of a defense counsel's duty is to investigate all probable sources of evidence, looking for facts that may cast a different light on the prosecution's case. While it might be a "long shot" to expect to find anything useful, the requested interviews were not remote; the would-be

witnesses had been close to the center of things. Given that Bailey's defense necessarily rested on discrediting Grant, questioning jurors who served with Grant was a material and potentially useful aspect of Bailey's defense.

Balancing these matters—the relatively weak interest of the public, the government, and the jurors in preventing *any* interviews whatever, against Bailey's significant interest in canvassing the jurors to ascertain whether they possessed evidence helpful to her defense, as could be the case—we hold that the district court erred in declining to let Bailey have, in the first instance, limited court-supervised access to Grant's fellow jurors.

### D. *Remedy*

■ We turn next to the question of remedy. While *Roviaro* was not decided on constitutional grounds, subsequent cases make it clear that an unjustified denial of access to witnesses within government control implicates constitutionally protected rights. *See Valenzuela*, 458 U.S. at 870–71, 102 S.Ct. at 3448. Thus, relief must be granted unless it can be said that the error was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). This error does not survive that standard on the record now before us. While as a practical matter one might be skeptical that Grant's fellow jurors would possess information capable of causing a different outcome, we cannot deny that possibility with sufficient assurance to affirm the judgment of conviction. We note that even without the jurors the defense found some evidence in support of its attack on Grant.[5] We think it would be premature, however, to require a new trial at this time, since it is first possible to find out if the jurors do possess evidence material and helpful to Bailey's defense. If

---

5. Defense witness Betty Adams testified at trial to Grant's reputation in the community for untruthfulness, and also recounted Grant's comment to a group of neighbors that if she were given enough money she might be able to sway the jury. The defense also dwelt upon inconsistencies in Grant's several conversations with the *Angiulo* district judge, when she reported Bailey's overture to him. At first she told the judge she hadn't told anyone about Bailey, only later admitting she had told her neighbor, Mary Tegan. The defense also pointed out some inconsistency between what Grant told the judge and what she later told the grand jury.

they do not, a new trial is clearly unnecessary.

We therefore retain jurisdiction and remand to the district court for the limited purpose of making findings and recommendations to this court as to what information, if any, Grant's fellow jurors possess that may be material and helpful to Bailey's defense. We specifically do not attempt to describe the precise means the court and the parties should employ in making such inquiry of the *Angiulo* jurors relative to Bailey's defense. We see no reason, however, to bar the presence of the government's attorney at the proceedings. Consideration may be given to depositions, hearing in open court or before a magistrate, or other methods. Because of the court's legitimate interest in protecting and reassuring the *Angiulo* jurors, inquiries should be tailored to whatever is fair and reasonable to accomplish the twin objectives of (1) affording Bailey and the court itself a reasonable opportunity to ascertain, as a threshold matter, whether the jurors possess sufficient useful evidence to warrant a new trial; (2) affording reasonable protection to the jurors' privacy, and to the public's and the government's interests in the now completed *Angiulo* trial. Upon completion of the proceedings, the court shall forthwith make findings and its recommendations concerning whether or not the jurors possess sufficient information to warrant a new trial. These together with a transcript of the proceedings shall be transmitted to the Clerk of this court, with copies of the findings and recommendations to be sent also to the parties (leaving it to the parties to make their own arrangements as to the transcript). We direct the court to act in this matter without delay.

We now turn to Bailey's other claims of error.

## II. ABANDONMENT

Bailey argues the district court erred by refusing to instruct the jury on the defense of abandonment.[6] She suggests the following testimony sufficed to require an abandonment instruction.

1) Grant's testimony that she thought Bailey was "kidding" when she made both her initial overture ("the Saturday morning overture") and her follow-up overture ("the Saturday evening phone call"):

Q. After you said that—after you told her the trial was almost over, what happened next [in the Saturday morning overture]?

A. Well she said that someone asked her to talk to me. And she says: Name your price. Name your figure. And I laughed, because I really thought she was kidding....

Q. And what if any conversation [in the Saturday evening telephone call] did you have with her?

A. Well, she called and asked me if I had thought above it. And I said—I did say, you've got to be kidding again.

2) Grant's testimony about Bailey's response to Grant's rejection of the offer on Sunday morning:

Q. ... What if anything was the conversation that you had with her [the next morning]?

A. Well, I called her. And I told her, I says, Audrey, no way, shape, or form. I says I can't believe you're doing this, you're going to be in a lot of trouble. And she says, I know, I didn't sleep all night over it.

3) Grant's assent to defense counsel's characterization of her impression of Audrey Bailey's state of mind after Grant's Sunday morning rejection of the offer:

6. The requested instruction was as follows:
It is a defense to the charge made against defendant that the defendant abandoned her specific intent to influence a juror to not perform her duties or to do something in violation of her duties as a juror. If you find that the defendant has persuaded you, by a preponderance of the evidence, that she voluntarily abandoned her specific intent to influence or impede a juror, then you must find defendant no guilty of the charge made against her. In determining whether an abandonment has occurred, you should consider any statements communicated by defendant indicating a change of heart.
We express no opinion on the correctness of this instruction as a matter of law.

Q. In fact, your impression from the Sunday conversation was she was backing off, right?

A. Yes, but it was too late then.

Bailey adverts to no case in which this circuit has upheld the application of the abandonment defense. Rather, she relies on *United States v. Lazzerini*, 611 F.2d 940 (1st Cir.1979), where this court upheld a conviction in a juror corruption case under 18 U.S.C. § 1503 (1970) that was challenged on the basis of the sufficiency of the evidence. Considering defendant-appellant's contention that he had "abandoned" his intent to violate the statute, the court in *Lazzerini* noted that the evidence of abandonment was ambiguous; thus, the jury may well have interpreted it in the prosecution's favor. *Id.* at 942. And there was no cognizable error since an abandonment instruction was not requested. *Id.* Bailey argues that *Lazzerini* "implicitly" recognized abandonment as a defense to a violation of 18 U.S.C. § 1503.

■ Assuming arguendo that Bailey's inference is correct,[7] we hold that it was not error to reject the proffered instruction. Abandonment is an affirmative defense, requiring a defendant to produce evidence that she abandoned her effort to commit the crime "under circumstances manifesting a complete and voluntary renunciation of [her] criminal purpose." *United States v. McDowell*, 705 F.2d 426, 428 (11th Cir. 1983) (quoting Model Penal Code § 5.01(4) (1985)).

■ We do not find the record to reveal the requisite "complete and voluntary renunciation." Bailey's apparent remorse the next day—"I didn't sleep all night over it"—was far from a complete renunciation of her criminal purpose. Criminal intent and contrition are not mutually exclusive states of mind. Indeed, nothing in Bailey's language suggests that the offer was not still open. And Grant's sense that Bailey was "backing off" is similarly ambiguous. The complete renunciation required by this defense would need much more.

It is also noteworthy that Bailey's remark about her sleeplessness was directly elicited by Grant's unequivocal rejection of her proposition, a rejection supplemented by Grant's observation to Bailey that "when the judge hears this you're going to be in a lot of trouble." The full exchange suggests Bailey may have been overcome by a fear of apprehension, rather than the genuine change of heart the abandonment defense is designed to encourage. *See* Model Penal Code § 5.01(4), comment 8 (1985).

In short, the record does not warrant the conclusion that the requested instruction should have been given.

## III. HEARSAY

■ Bailey argues the district court committed reversible error by allowing Grant and Mary Tegan to testify to an out-of-court statement made by Grant. Grant testified that after receiving Bailey's Saturday morning overture—"Name your price. Name your figure."—she immediately sent her son next door to summon her neighbor, Mary Tegan; when the pair returned, Grant told Tegan, "Mary, Audrey was just here and asked me how much I wanted. You know, name a price, name a figure." Tegan also testified to the conversation:

Q. And what did Nancy Grant tell you Audrey Bailey had said to her?

A. She said that Audrey Bailey said, "Name your figure, name your price."

The hearsay testimony was admitted, apparently under the "excited utterance" exception to the hearsay rule. Fed.R.Evid. 803(2). Tegan also testified that at the time of this conversation Grant had appeared "sort of nervous, upset."

Federal Rule of Evidence 803(2) allows hearsay testimony of "[a] statement relat-

---

7. We express no view whether abandonment is a viable defense for a violation of this statute. Arguably, Congress's criminalization of the act of "endeavoring" to influence a juror should be taken at face value: once the endeavor has been made the crime is complete. Moreover, it is arguable that an "endeavor" is less purposeful than an "attempt," *see Lazzerini,* 611 F.2d at 941, and that the law should only recognize abandonment as a defense to the latter. On the other hand, the policy underpinning the abandonment defense—providing an incentive for the repudiation of incipient criminal acts—is identical in both cases.

ing to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Courts have said that the exception has three elements: 1) a startling event or condition; 2) a statement made while the declarant was subject to the influence of the event or condition; and 3) a relation between the statement and the event or condition. *See United States v. Moore*, 791 F.2d 566, 570 (7th Cir.1986). We discuss the evidence as to each element.

1) There was evidence of a startling event. Common sense suggests that a juror would be "startled" by a neighbor's attempted bribe. Both Grant and Tegan testified, moreover, that Grant was upset, or appeared to be, by the conversation with Bailey. That Grant's initial response to Bailey's offer had a flippant tone [8] did not compel the judge to find that the event was not startling. Sarcasm may mask other feelings. Grant testified, moreover, that while initially she may have thought Bailey was just kidding, by the end of their encounter that Saturday morning she thought Bailey was serious.

2) The court examined Grant to determine the temporal relation between Bailey's overture and Grant's statement to Tegan. It was satisfied that the time lapse—apparently about three minutes—was short enough to warrant the conclusion that Grant was still under the excitement of the event when she spoke. A commentator has written,

> Perhaps an accurate rule of thumb might be that where the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective though process. Testimony that the declarant still appeared "nervous" or "distraught" and that there was a reasonable basis for continuing emotional upset will often suffice.

*McCormick on Evidence* § 297, at 856 (E. Cleary 3d ed. 1984) (footnotes omitted). Grant's and Tegan's testimony indicated that Grant was indeed upset at the very moment she made the statement to Tegan.

3) Finally, there can be no doubt that Grant's statement—itself a description of the startling event—related to that event.

Thus, there was a sufficient basis for the court to have found that each of the conditions necessary for the application of the excited utterance exception was met. There was no abuse of discretion in admitting the testimony.

## IV. OTHER ISSUES

■ Bailey argues that the prosecutor in his closing argument made a prejudicial reference to facts not in evidence. The prosecutor asserted that Nancy Grant "believed at that time [the time of the Saturday morning overture] that the Angiulos or one of the defendants had sent Audrey Bailey." As there is evidence in the record [9] to support this assertion, we do not believe it was the sort of "factual misstatement" that required the court to give a curative instruction. There was no error.

■ Bailey also contends that the district court erred by refusing to allow some

---

**8.** When asked by counsel if Bailey had mentioned anything (in the Saturday morning overture) about Grant "talking to someone," Grant said,

> Oh, she said that, you know, If, you know, if I wanted to, someone would talk to me. And I says, Oh, tell him to send a card when it's over....

**9.** Upon cross-examination, Grant gave the following response to a question about whether she had been "set up," a thesis Grant had advanced in a local newspaper shortly after her dismissal from the jury:

> I said it's so obvious that you figure right away it must have been Angiulo, but I just felt that someone had set me up.

Additional support for the prosecutor's assertion is found in the following exchange between defense counsel and Grant:

Q. In fact by the end [of] the day on the 11th, you no longer believed that this was coming from the Angiulos at all. You thought you were being set up by the government, right?

A. Well, I didn't say it didn't come from, as I told the judge, in a sense, that I'm damned if I do and I'm damned if I don't....

While nothing is crystal clear from these exchanges, we think the prosecutor's assertion was a not unreasonable interpretation.

of Grant's neighbors in the housing project to testify that Grant openly discussed the *Angiulo* case with them, thus violating her juror's oath. She argues that notwithstanding the prohibition against attacking a witness's credibility through extrinsic evidence, *see* Fed.R.Evid. 608(b), the neighbors' testimony should have been admitted under either Rule 404(a)(2), as a pertinent character trait of the victim of a crime, or under Rule 404(b), as evidence of motive. We reject the contention that Grant, the juror Bailey supposedly sought to influence, was the "victim" of Bailey's alleged crime for purposes of Rule 404(a)(2). The victim, if any, of a violation of 18 U.S.C. § 1503 is the party against whom the juror would be influenced, here the United States. We are also unpersuaded that the trial court abused its discretion in refusing to admit the evidence of Grant's talkativeness as evidence of a motive to fabricate. The connection is attenuated between Grant's purported garrulousness and her alleged motive to do Bailey in. This was the kind of matter within the court's authority to determine.

*We retain jurisdiction and remand to the district court with directions that it forthwith make findings of fact and recommendations to this court in accordance with this opinion.*