Louis NERON, Petitioner, Appellee,

v.

James E. TIERNEY, etc., et al.,
Respondents, Appellants.

No. 87–1710.

United States Court of Appeals,
First Circuit.

Heard Dec. 11, 1987.

Decided March 15, 1988.

Peter J. Brann, Asst. Atty. Gen., with whom James E. Tierney, Atty. Gen., and Thomas D. Warren, Deputy Atty. Gen., Augusta, Me., were on brief, for respondents, appellants.

Joseph H. Field with whom Mary Lou Ciolfi and Loyd, Bumgardner & Field, Brunswick, Me., were on brief, for petitioner, appellee.

Before COFFIN, TORRUELLA and SELYA, Circuit Judges.

SELYA, Circuit Judge.

In October 1985, appellee, Louis Neron, was convicted in a Maine state court of multiple counts of gross sexual misconduct in violation of 17–A Me.Rev.Stat.Ann. § 253 (1985). He thereafter moved for judgment of acquittal or in the alternative, a new trial. The motion was denied and sentence imposed. The Maine Supreme Judicial Court, sitting as the Law Court, rejected his direct appeal. *State v. Neron*, 519 A.2d 197 (Me.1986) (*Neron I*).

Undaunted, Neron applied for habeas review in the United States District Court for the District of Maine under 28 U.S.C. §§ 2241–54, naming James E. Tierney, Maine's attorney general, and James R. Clemons, warden of the state penitentiary, as respondents. He urged that he had been convicted in derogation of his constitutional rights to (1) due process and (2) trial by an impartial jury. The district court was persuaded that petitioner's fourteenth amendment rights had been

abridged, and granted relief. *Neron v. Clemons*, 662 F.Supp. 854 (D.Me.1987) (*Neron II*). We reverse.

## I

The procedural background and factual underpinnings of the charged crimes and petitioner's state trial are well summarized in *Neron I*, 519 A.2d at 198–99, and no useful purpose would be served by retracing the Law Court's steps. Rather, we will confine ourselves to an elucidation of the facts directly germane to whether Neron was unfairly saddled with a juror who should not have been sworn, for that is the heart of the habeas case. We take these (essentially undisputed) facts from the state court record.

Robert Neron, one of appellee's sons, was not in court during appellee's trial. He claimed never to have seen a jury roster, nor to have known the composition of the sitting jury. He was seemingly a stranger to his father's ordeal. Within a day or two after the verdict, however, Robert's detachment ended. While at the family homestead, he happened upon a jury list. Spotting the name of a particular juror,[1] Robert concluded that she was someone with whom he had once been romantically entangled. This discovery became the centerpiece of his father's posttrial motion, wherein petitioner claimed that the juror had not only consorted with Robert,[2] but had also met petitioner's wife, Lucy, and other son, Paul. The juror's failure spontaneously to disclose these meetings or reveal the relationship, Neron asserted, constituted misconduct. Moreover, it deprived the defense of a meaningful opportunity to inquire into her neutrality. This concatenation of circumstances, petitioner contended, rendered his trial constitutionally deficient.

The state judge convened an evidentiary hearing during which Neron's counsel enjoyed relatively free rein in the presentation of evidence. These ground rules notwithstanding, petitioner called only Robert as a witness. He then rested, but urged the judge, if inclined to disallow the motion, to summon Juror 38 and question her. The judge declined this invitation, chronicling the general reluctance of Maine courts to undertake such an inquiry and concluding that, given the dearth of evidence of bias or misconduct, a juror interview was unwarranted. The new trial motion was denied and the Law Court subsequently affirmed. *Neron I*, 519 A.2d at 201.[3]

Petitioner's reception in a federal forum was more cordial. After consideration of the state court record, the federal district judge ruled that:

> When allegations of juror partiality or misconduct are supported by particularized and nonfrivolous evidence, due process requires the trial court to question the juror on the record about the juror's partiality or misconduct in light of the evidence, unless some other evidence clearly establishes that no such questioning is required to guarantee the impartiality or proper conduct of the juror.

*Neron II*, 662 F.Supp at 862. Applying this principle to petitioner's case, the district court determined that due process mandated interrogation of the juror. *Id.* at 865. It ordered the writ to issue unless the state superior court, within a set period, either granted a new trial or conducted a more intensive inquiry (including an interview of Juror 38). *Id.*

---

**1.** This juror is identified in the record as "Juror 38," an apparent reference to the overall venire from which the panel was drawn. Though we use the same sobriquet, we make plain at the outset that the juror in question—notwithstanding her numeric designation—was one of the twelve who adjudicated Neron's guilt at trial.

**2.** Respondents tell us that Robert's inamorata and Juror 38 were never shown to be one and the same person. They note that, although the name was the same, Robert did not see Juror 38 during or after the trial and made no physical identification. We need not marshal theories as to the natural laws of probability and coincidence. For today, we simply remark the state's point, but assume *arguendo* that Juror 38 was indeed Robert's erstwhile infatuate.

**3.** Insofar as the motion raised points apart from juror bias and/or misconduct, none have been pressed in the present proceeding. We confine our discussion accordingly.

## II

Our role in a case such as this is more constrained than on direct appeal. In habeas jurisdiction, "we review state convictions solely for error of constitutional stature." *Puleio v. Vose,* 830 F.2d 1197, 1204 (1st Cir.1987). *See* 28 U.S.C. § 2254(a). It is not enough that we repine some state court practice; "it must be established not merely that the [action] is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the [Constitution]." *Cupp v. Naughten,* 414 U.S. 141, 146, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). Congress, after all, did not authorize the federal courts to be roving watchdogs to sniff out all ostensible errors in state criminal proceedings. *See Lefkowitz v. Fair,* 816 F.2d 17, 23 (1st Cir.1987).

As to matters of fact, the state courts' findings are usually entitled, under 28 U.S.C. § 2254(d), to a presumption of correctness. *Sumner v. Mata,* 449 U.S. 539, 547–51, 101 S.Ct. 764, 769–71, 66 L.Ed.2d 722 (1981) (*Sumner I*); *Tavares v. Holbrook,* 779 F.2d 1, 3 (1st Cir.1985).[4] Federal courts must "face up to any disagreement as to the facts and ... defer to the state court unless one of the factors listed in

§ 2254(d) is found." *Sumner v. Mata,* 455 U.S. 591, 597–98, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (per curiam) (*Sumner II*). In this case, the court below refused to extend the customary presumption of correctness. In its view, "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing," 28 U.S.C. § 2254(d)(2), thus triggering a statutory exception. *Neron II,* 662 F.Supp. at 863. We cannot accept the district court's conclusion, however, for it merely assumes that which it set out to decide.

Section 2254(d)(2) does not allow us to superimpose federal choices upon the state courts merely because we think some "other" procedure might have been "better." So long as the state court has provided "an *opportunity* for full and fair litigation," *Stone v. Powell,* 428 U.S. 465, 482, 96 S.Ct. 3037, 3046, 49 L.Ed.2d 1067 (1976) (emphasis supplied), the federal mandate is satisfied. The proper focus of analysis, we suggest, is more narrow than the district court appears to have assumed: in habeas review, the focal point is simply the constitutional adequacy of the procedures utilized to determine whether juror inquiry was necessary to resolve questions of bias and/or misconduct, nothing broader or

---

**4.** Section 2254(d) provides in relevant part as follows:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

\*　\*　\*　\*　\*　\*

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

more generalized. In the case at bar, the trial judge held a posttrial evidentiary hearing, allowed unlimited presentation of live (nonjuror) witnesses, and permitted cross-examination. In so doing, the state provided Neron the sort of "opportunity" to justify the necessity of a juror interview that the Constitution and section 2254(d)(2) required.

We find Maine's approach to have been comfortably within the universe of constitutionally acceptable ones. Its procedural scheme, requiring Neron to make a satisfactory threshold showing of substantiality before invading the juror's privacy, cannot be said to be so harsh as to offend the Constitution. *Cf. United States v. Valenzuela–Bernal*, 458 U.S. 858, 873, 102 S.Ct. 3440, 3449, 73 L.Ed.2d 1193 (1982) (under Compulsory Process Clause, accused must make preliminary showing that aliens could likely provide evidence "both material and favorable to the defense" before government required to produce them).

The deference accorded to the state courts' findings of fact can also be undercut by a demonstration that "the material facts were not adequately developed at the State court hearing." 28 U.S.C. § 2254(d)(3). The district court found this exception, too, to have been mobilized in Neron's case. *Neron II*, 662 F.Supp. at 863. We disagree. As we have just remarked, Neron was given the essential "opportunity to prove actual bias" at an evidentiary hearing. *Smith v. Phillips*, 455 U.S. 209, 215, 102 S.Ct. 940, 945, 71 L.Ed.2d 78 (1982). At that stage, petitioner failed to show enough to necessitate the further step of juror inquiry. Moreover, his default was not because of roadblocks unfairly erected by the prosecution, the trial court, or the circumstances. To the extent that the facts necessary to cross the threshold might not have been fully developed, it was—as we point out *infra*—because of a series of deliberate tactical choices on petitioner's part. Inasmuch as "the totality of the state proceedings provided the necessary opportunity to liti-

gate," *Pignone v. Sands*, 589 F.2d 76, 79 (1st Cir.1978), Neron cannot be heard to complain that he chose to avail himself of the opportunity but sparingly.

In our view, what transpired in the Maine courts, though perhaps not a textbook model, was adequate to satisfy the minimum level demanded by 28 U.S.C. § 2254(d). To be sure, it might have been preferable to allow a juror interview out of an abundance of caution. But we see no *federally-redressable* deficiency in the manner in which the session was conducted or the facts developed. *Cf., e.g., Ristaino v. Ross*, 424 U.S. 589, 597 n. 9, 96 S.Ct. 1017, 1022 n. 9, 47 L.Ed.2d 258 (1976) (voir dire inquiry disallowed by state court not constitutionally compelled even though, on direct appeal in federal court, disallowance would have comprised error). Accordingly, unless the residual exception applies—that is, unless the Maine courts' factual determinations that juror bias and/or misconduct were absent were not "fairly supported by the record," 28 U.S.C. § 2254(d)(8)—the presumption of correctness attaches in full flower. *See Judd v. Vose*, 813 F.2d 494, 495 n. 1 (1st Cir.1987).[5] Indeed, where (as here) claims of juror partiality are involved, the state courts' factfinding must be treated with "special deference." *Patton v. Yount*, 467 U.S. 1025, 1037–38 n. 12, 104 S.Ct. 2885, 2891 n. 12, 81 L.Ed.2d 847 (1984).

Against this backdrop, we proceed to scrutinize the validity of petitioner's basic claim.

### III

A. The Due Process Clause guarantees a criminal defendant that his trial will "comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). The right to trial by jury in a criminal case is an important feature of the justice system. In turn, the value of the right consists principally in the neutrality of the venire. All would agree that an impartial jury is an integral compo-

---

**5.** Neron, of course, has the burden of "establish[ing] by convincing evidence that [any such]

factual determination by the State court was erroneous." 28 U.S.C. § 2254(d).

nent of a fair trial. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 551, 96 S.Ct. 2791, 2799, 49 L.Ed.2d 683 (1976). To preserve the integrity of the process, trial courts must jealously safeguard jurors' impartiality.

The ways of due process, however, cannot be lifted intact from some handy manual. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Rather than being taken off the rack, the strictures which the Clause imposes must be tailored to fit each particular situation. *See Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). And within a given situation, a broad range of alternatives, each different from the others, may suffice to alleviate due process concerns. Because of this fluidity, crosstyping the bloodlines of a particular case with the imperatives of due process is necessarily a *sui generis* exercise. *United States v. Moon,* 718 F.2d 1210, 1234 (2d Cir.1983), *cert. denied,* 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984).

These precepts have clear pertinence to the matter at hand. We have no doubt that a court must satisfactorily probe nonfrivolous charges of jury spoilage. *See Smith v. Phillips,* 455 U.S. at 218, 102 S.Ct. at 946; *Remmer v. United States,* 347 U.S. 227, 230, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *Dennis v. United States,* 339 U.S. 162, 171–72, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950). But, though adequate inquiry must be made into allegations of this genre, *see, e.g., United States v. Richman,* 600 F.2d 286, 295 (1st Cir.1979) (juror misconduct); *United States v. Corbin,* 590 F.2d 398, 400 (1st Cir.1979) (juror bias), "adequacy" is itself a dynamic concept; the technique for achieving "adequacy" need not always be the same. We have long acknowledged the case-specific nature of such explorations: "A district court has broad, though not unlimited, discretion to determine the extent and nature of its inquiry into allegations of juror bias." *Corbin,* 590 F.2d at 300. In our view, the outer limits imposed by the Constitution on that discretion, like due process requirements generally, cannot be plotted by any static set of measurements.

Our task, therefore, is to ascertain precisely what occurred in the state proceedings and then weigh and balance the various interests implicated by the omission of any posttrial interrogation of Juror 38. It is in this manner that a court can best determine whether due process demanded that more be done than was done in this instance. We must factor into that balance, among other things, the risk that the procedures employed by the state court might result in an erroneous decision, and thus an injustice. *See Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). The higher the degree of risk, the more heavily the scales will tip in petitioner's favor. But we are also required fairly to assess the other affected interests, *id.,* which in this instance consist largely of the state's goal of protecting the integrity of the jury system (and, as a subset of that objective, the need to shield from undue beleaguerment citizens who by their jury service perform a public service). *Cf. United States v. Bailey,* 834 F.2d 218, 223–25 (1st Cir.1987) (request to interview jurors empanelled in earlier case must be assessed in light of twin objectives: [1] affording defendant, as a threshold matter, reasonable opportunity to ascertain likelihood that jurors possess useful evidence, and [2] affording reasonable protection to jurors' privacy and to public's and government's interests in the trial process).

In order to calculate the risk of taint, we look first and foremost to the efficacy of the procedural safeguards employed by the state tribunal, and the capacity *vel non* of those measures to ensure fairness. As an adjunct to this inquiry, we also try to gauge the likely increase in protection of the right to trial by an impartial jury foreseeably engendered by making a post-verdict juror interview compulsory. *See Mathews,* 424 U.S. at 335, 96 S.Ct. at 903.

B. In this case, the record makes manifest that the superior court judge took great pains to keep petitioner's right to an

impartial jury inviolate. At the trial's beginning, he conducted a penetrating voir dire. He quizzed potential jurors as to whether they knew any of the protagonists and probed searchingly for untoward exposure to pretrial publicity. The judge circulated questionnaires designed to screen out bias stemming from the loathsome nature of the offenses charged. In strong terms, he repeatedly admonished the talesmen that they must "not start out th[e] case with a predisposed state of mind because of something that happened in the past." He made clear the importance of each and every juror possessing "a fair and open mind from beginning to end." The force of the admonitions and the exhaustiveness of the inquiry was matched by commendable liberality in the excusal process. The judge *sua sponte* released from service each juror who indicated the remotest connection to the defendant or any witness, or who presented the tiniest reason for placing his or her neutrality in doubt. All in all, the rigor and thoroughness of the voir dire furnished a highly efficacious method of minimizing the risk of juror partiality.

■■■ The judge took no less care in the later stages of the case. His charge was exemplary. When the posttrial motion ensued—and it was barebones at best[6]—he did not reject it out of hand, but scheduled a prompt evidentiary hearing. Despite the obviously speculative quality of the claim, petitioner's presentation was not limited. That presentation, latitude notwithstanding, failed to disclose the slightest bit of meat on the skeleton. It was only then that the judge decided it would be a needless intrusion to cross-question Juror 38 and denied petitioner's eleventh hour request that he do so. The record, we think, reflects that the trier exhibited commend-

able solicitude for the accused's right to trial by an impartial jury.

C. Having examined this much of what the state court undertook to do, we widen the lens of inquiry to include the likely effects and legal consequences of the decision to forgo a juror interview. We start with bedrock: the hallmark of a juror's impartiality is his or her ability to evaluate guilt or innocence on the basis of the evidence. *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961); *United States v. Porcaro*, 648 F.2d 753, 758 (1st Cir.1981). If genuine doubt about impartiality has arisen, direct questioning may be an excellent way to probe it; indeed, such a step may be necessary in order to be certain that the entire picture is suitably explored. *See Smith v. Phillips*, 455 U.S. at 217 n. 7, 102 S.Ct. at 946 n. 7 (determinations made in hearings concerning juror bias "will frequently turn upon testimony of the juror in question"); *Remmer*, 347 U.S. at 229, 74 S.Ct. at 451; *Tavares v. Holbrook*, 779 F.2d at 3–4. In such circumstances, an interview may provide the judge with first-hand insight into a juror's frame of mind. Since reliable evidence can be gained from such an interview, it follows that conducting one will usually decrease the risk of a wrong decision on the issue of juror partiality.

But this generality presumes a showing sufficient to undergird genuine doubts about impartiality. We have found no case which purports to lay down an ironclad rule necessitating posttrial interrogation upon demand of every juror in every circumstance. The Constitution, as we read it, imposes no such across-the-board requirement. In doubtful cases, questioning the juror is often invaluable—but at either end of the spectrum the utility of such a protocol is markedly diminished. There are at

---

**6.** We agree with the district court that a claim of bias or misconduct on the part of a juror need "satisfy a rather low threshold of significance" to ignite a due process requirement of adequate inquiry. *Neron II*, 662 F.Supp. at 862 (citation omitted). In this case, the state court did not explicitly find that the allegations in the motion cleared the threshold of nonfrivolity. We assume, without deciding, that the averments can be regarded as nonfrivolous. Allega-

tions which are frivolous—that is, entirely conclusory or conjectural, contradicted by the record, inherently incredible, patently false, or obviously inconsequential—do not trigger any duty of inquiry and do not require that a hearing be held. *Cf. Mack v. United States*, 635 F.2d 20, 26–27 (1st Cir.1980) (discussing when application under 28 U.S.C. § 2255 may be summarily dismissed).

one extreme situations where the evidence shows the well to be so heavily poisoned that the inference of taint is inescapable; in such straitened circumstances, interrogating the juror would be an exercise in superfluity. On the other hand, there are situations where the evidence of impropriety may be so slight or conjectural as not to support any reasonable inference of prejudicial bias or misconduct. At this extremity, as at the other, interviewing the juror will not significantly decrease the risk of error. As cases shade from these poles toward the gray vastness of the spectrum's center, decisions grow increasingly more difficult, and the presumptive value of direct inquiry increases commensurately. At the termini, however, the presumptive value is low. The need for post-verdict interviewing is dubious at best, and ultimately depends on the nature and weight of the independent evidence underbracing the claim and on the trial justice's sound discretion.

D. As we turn to an assessment of the proof which Neron put forward, it becomes readily apparent that the matter before us falls at the low end of the continuum. This was not a case where some "presumptively prejudicial" datum, like an attempted bribe, had come to light. *See Remmer v. United States,* 347 U.S. at 229, 74 S.Ct. at 451. The mere fact that Neron's son had dated a woman who later became a juror was not "so inherently prejudicial that [petitioner] was thereby denied his constitutional right to a fair trial." *Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). Neron was obliged to make a more cogent showing before it became constitutionally imperative to recall the juror. He failed entirely in this effort. Indeed, petitioner's asseveration, when unrolled, embodied evidence so sparse, a pyramiding of inferences so fragile, a thesis so speculative, as to envelop the bias/misconduct charge in a miasma of doubt. Asthenic to begin with, petitioner's claim was weakened rather than strengthened by his presentation at the hearing. We summarize the testimony of his sole witness, Robert Neron.

For under a year, ending some fourteen or fifteen months before petitioner's jury was empanelled, Robert had an intimate relationship with a woman assumed to be Juror 38. *See supra* note 2. They saw each other once or twice weekly, usually at her apartment. Robert never said why the relationship petered out. After it ended, the couple had several chance meetings; the last occurred roughly four months before trial. None were described as eventful. As to the woman's known contacts with other family members, Robert stated that she had coffee with his mother on one occasion. He recalled her telling of having seen Paul at a barbecue in 1983 or 1984, but Robert could provide no first-hand information about this encounter. And, he could identify no occasion on which the juror had any communication with his father.

Robert completed his testimony without giving the faintest indication that he and his paramour parted on unfriendly terms, that hostility had developed thereafter, that the woman knew his father (let alone bore him any grudge), or that there was any residue of ill feeling between the once and former lovers. Petitioner rested at this point. His counsel, though conceding that Juror 38 may not have recognized the defendant or any family member witnesses during the jury selection process, argued that she *must* at some point have made a mental connection between Robert and the accused. Since she did not reveal this connection, the lawyer reasoned, the juror was chargeable with misconduct and bias.

The argument, we believe, was fatally flawed. Its linchpin—the notion that Juror 38 "inevitably" realized the interrelationships—was built not on any solid evidentiary foundation but on the shifting sands of conjecture, speculation, and surmise. As our narration suggests, the witness's testimony was singularly brief and unilluminating. Faced with such an exiguous record, the trial judge concluded that the juror did not remember either Lucy or Paul Neron from what were (at most) casual encounters with them. He further found that she either did not know or did not recall petitioner, that she entertained no bias, and

that her silence was not the product of misconduct. Believing petitioner not to have raised a legitimate question as to Juror 38's bona fides, the judge refused to prolong the inquiry or allow an intrusion upon her privacy.

On appeal, the Law Court synthesized the trial judge's findings into a probable conclusion: that Juror 38 never realized the accused was a part of her former swain's immediate family. *Neron I*, 519 A.2d at 199. The Law Court deemed it "significant that the[ ] brief meetings ... made so faint an impression on the two family member witnesses that they reciprocally failed to recognize the juror." *Id.* From this fact, the inference that the relationship probably had not involved the Neron family to a degree sufficient to impair the juror's impartiality followed logically. *Id.* And because the evidence supported the trial judge's factual determinations, declining to interview Juror 38 was not error. *Id.* at 199–200.

On our plenary review of the state court record, we find this scenario to be altogether plausible, perhaps likely. The key inferences drawn by the trial judge and validated on direct appeal were reasonable ones. We cannot say that the state courts' conclusions are other than anchored in the record with sufficient solidity that we must honor them. *See Rushen v. Spain*, 464 U.S. 114, 120, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (per curiam) (state court's findings of fact to be set aside only if not fairly supported by the record); *Campbell v. Fair*, 838 F.2d 1, 2–3, 5 (1st Cir.1988) (deference owed to state courts extends to inferences reasonably drawn from underlying facts). *See generally* 28 U.S.C. § 2254(d), quoted *supra* note 4.

These (supportable) findings, we think, effectively foreclosed the claims of juror misconduct or bias. The juror's silence during voir dire could not be interpreted as false or misleading so long as she did not remember (or had never met) Lucy, Paul, or Louis Neron. The defense did not request that Robert be mentioned or the talesmen asked whether they knew him. Petitioner cannot now hawk the proposition that the juror's failure to volunteer her past affair with Robert constituted a falsehood. *See United States v. Rhodes*, 556 F.2d 599, 600–01 (1st Cir.1977) (jurors are held to answer only those questions actually asked on voir dire, not other questions which should have been asked); *cf. State v. Berberian*, 118 R.I. 413, 416, 374 A.2d 778, 780 (1977) (party who by exercising "reasonable diligence on the voir dire examination should have known of a juror's disqualification waives the right to object thereto by waiting to raise the objection until after the verdict"). Similarly, so long as the link between Robert and the accused was not forged in Juror 38's mind, there existed no possible source of bias. Even if every shred of Robert's testimony were taken as gospel, the likely inferences from it—the inferences which the state courts permissibly chose to draw—were manifestly inadequate to take petitioner's case to the next plateau. The bottom line is that Neron failed to shoulder his burden of production. *See United States v. Williams*, 809 F.2d 75, 85 (1st Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 2484, 96 L.Ed.2d 377 (1987); *United States v. Perrotta*, 553 F.2d 247, 249 (1st Cir.1977). Since the demonstrable risk of an erroneous decision was, therefore, very low, a juror interview probably would not have decreased it.

E. Knowing petitioner's interest in an unsullied jury and having taken the measure of the relative risks and likelihood of error, we look now to the other side of the scale. We find it to be heavily invested. As the Court has recently observed, the "government interest in insulating the jury's deliberative process" is a weighty one. *Tanner v. United States*, —— U.S. ——, 107 S.Ct. 2739, 2747, 97 L.Ed.2d 90 (1987). A court must not allow jurors to be "harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct." *Id.* (quoting *McDonald v. Pless*, 238 U.S. 264, 267–68, 35 S.Ct. 783, 784, 59 L.Ed. 1300 (1915)). "It is not at all clear ... that the jury system could survive such efforts to perfect it." *Id.*

*Tanner*, while helpful, is admittedly not on all fours. There, the issue turned on enforcement of Fed.R.Evid. 606(b), a rule of evidence specifically designed to insulate the deliberative process.[7] The case at bar is not as strong as *Tanner*, for no rule of evidence barred juror testimony in this case. Nonetheless, the governmental interest remained at a high peak; courts generally "should be hesitant[ ] to haul jurors in after they have reached a verdict ... to probe for potential instances of bias, misconduct, or extraneous influences." *United States v. Moon*, 718 F.2d at 1234. *See also United States v. Bailey*, 834 F.2d at 224.

Based on the record in this case, we are constrained to conclude that petitioner's interest in having the trial judge interview the juror was relatively modest. The procedures employed by the court to eliminate potential sources of bias were extensive. Petitioner had other ways available to him, short of a juror interview, to try to lay the requisite foundation—yet he eschewed them all. Rather than presenting evidence which had some tendency to disprove the entirely logical inference that Juror 38 never associated him with Robert, Neron rested on his son's sketchy testimony. He chose not to question Robert about such important matters as the circumstances of the break-up or the existence of enmity of any sort. There was no testimony that Robert had ever discussed his father with the juror. And petitioner elected to call neither Lucy nor Paul to the stand. As a result, evidence of bias or misconduct was virtually nonexistent. Because the government's interest in protecting the deliberative process and in shielding the juror from

harassment was substantial, it far overbalanced the meagre counterweight tendered by petitioner.

■ F. The caselaw, as we read it, fully supports the conclusion that a convicted defendant cannot lay claim to a constitutional right to cross-question jurors in the absence of an adequate evidentiary predicate. Our decision in *United States v. Williams*, 809 F.2d at 83–86, is illustrative. In *Williams*, we addressed the question of whether a district court was required to conduct a juror interview when defense counsel alleged that the accused had been seen in handcuffs. After noting that defendant had asked for a voir dire but had not pursued a ruling, we stated that in the "absence of a showing of actual prejudice" it was not plain error for the trial court to decline to interview the juror *sua sponte*. *Id.* at 85. Although the circumstances were different, *Williams* is a vivid reminder that the burden is on a defendant to provide at least a modicum of evidence sufficient to warrant an intrusion into the sphere of jury privacy. *See also United States v. Perrotta*, 553 F.2d at 249 (listing cases to like effect).

By the same token, *Williams* also illustrates that not every allegation of juror bias or misconduct establishes a need to interrogate the juror. As we recently stated in a different (but analogous) context, "[w]e think it not too onerous a burden to require that a defendant who asserts the affirmative of so serious a proposition lay enough cards face-up on the table" to justify further inquiry. *United States v. Hoffman*, 832 F.2d 1299, 1303 n. 4 (1st Cir. 1987).[8] Although due process may well

---

7. Fed.R.Evid. 606(b) provides in pertinent part: Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon ... [a] juror's mental processes ..., except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

8. *Hoffman*, of course, was a case on direct appeal, involving what was alleged to be a prosecution effort at witness intimidation. Given the multiple layers of deference which permeate our habeas review of state court proceedings, we can conceive of no plausible basis for requiring a habeas applicant to heft a burden of production *lighter* than that which a criminal defendant must shoulder on direct appeal.

demand interrogation of a juror *after* the defendant makes some satisfactory threshold showing of partiality or misconduct, the threshold was not crossed in this case. *See Taylor v. Mabry,* 593 F.2d 318, 320 (8th Cir.1979) (per curiam) (in habeas proceeding, request for juror interviews properly denied where allegations of misconduct "speculative"; petitioner was "requesting permission to conduct a fishing expedition"). While we agree generally with the district court's insightful approach to the problems presented by a claim of juror taint, we disagree as to where the line must be drawn and as to what the court below foresaw as the near inevitability of juror interrogation.

G. Having performed the requisite balancing, we find that due process did not require the trial court to do more than was done in the circumstances of this litigation. Specifically, we hold that the court was under no constitutional compulsion, on this gossamer record, to reach out to interrogate Juror 38.

## IV

■ The sixth amendment explicitly guarantees criminal defendants in federal courts the right to trial by an impartial jury. *Nebraska Press Ass'n v. Stuart,* 427 U.S. at 551, 96 S.Ct. at 2799. This fundamental right is made binding upon the states through the fourteenth amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923 (1965); *Puleio v. Vose,* 830 F.2d at 1203 n. 4. A juror, however, need not be disqualified merely because he or she knows the defendant or has some knowledge about the case. *Irvin v. Dowd,* 366 U.S. at 723, 81 S.Ct. at 1643. A defendant must show that the knowledge somehow impaired—or had the ineluctable tendency to impair—the juror's neutrality. That is to say, the defendant must show actual, or at least likely, prejudice stemming from the participation of the allegedly biased juror. *United States v. Porcaro,* 648 F.2d at 758.

In this instance, Neron was considerably shy of sustaining this burden. The root causes of this failure were identical to those discussed above, *see supra* Part III, and we see no point in painting the lily overmuch. Given that petitioner fell far short of demonstrating any actual bias, or the likelihood of actual bias, on the part of Juror 38, it follows that he has not shown that his constitutional right to an uncolored jury was in any way compromised.

## V

On the record of this case, and in the long shadow of the supportable state court findings, appellee has failed to convince us that any cognizable error of constitutional dimension infected the fairness of his trial or the impartiality of the jury which convicted him. We think that the procedures adopted in the state courts to ferret out taint pass federal constitutional muster and that none of Neron's rights under the sixth or fourteenth amendments were trammelled by the trial court's failure to order an interview. Under the circumstances at bar, whether or not it might have been better practice to do so, the Constitution did not insist that the judge interrogate Juror 38 upon demand.

We need go no further. For the reasons elucidated herein, we quash the writ of habeas corpus provisionally issued by the district judge and order that the habeas application be denied and dismissed.

*Reversed.*